**UNITED STATES of America, Plaintiff,**

v.

**FLEET FACTORS CORPORATION, Clifford Horowitz, and Murray Newton, et al., Defendants.**

Civ. A. No. CV687–070.

United States District Court, S.D. Georgia, Statesboro Division.

May 12, 1993.

Edmund Alexander Booth, Jr., Kenneth C. Etheridge, Augusta, GA, Wilda Cobb, U.S. E.P.A., Atlanta, GA, Donald A. Carr, Anne S. Almy, U.S. Dept. of Justice, Land and Natural Resources Div., Jon A. Mueller, John C. Cruden, U.S. Dept. of Justice, Environmental Enforcement Section, Bradley Campbell, U.S. Dept. of Justice, Environmental & Natural Resource, Policy, Legislation & Sp. Litigation, Myles E. Flynt, Acting Asst. Atty. Gen., Environmental & Natural Resources, Washington, DC, for U.S.

Mary Jane Norville, Patricia Thrower Barmeyer, King & Spalding, Atlanta, GA, Richard Edwin Miley, Richard E. Miley, Atty. at Law, P.A., North Augusta, SC, for Fleet Factors Corp.

Charles B. Merrill, Jr., Merrill, Stone & Parks, Swainsboro, GA, for Clifford Horowitz.

Murray Newton, pro se.

Cecil A. Citron, Sherman, Citron & Karasik, New York City, for Robert Kolodney, as Trustee of Swainsboro Print Works, Inc.

## MEMORANDUM OF OPINION AND ORDER

BOWEN, District Judge.

This Memorandum of Opinion sets forth the Fed.R.Civ.P. 52(a) conclusions of law following a non-jury trial of the captioned case.[1] In this action brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–75, the United States of America ("Government") seeks to recover from Fleet Factors Corporation ("Fleet"),[2] Clifford Horowitz, and Murray Newton the response and enforcement costs associated with a hazardous substance removal.[3] For the reasons stated below, Fleet is liable under 42 U.S.C. § 9607(a)(2) as an owner or operator at the time of hazardous substance disposal because the actions of its agents void a statutory exemption for secured creditors. Fleet is not . liable ' under 42 U.S.C. § 9607(a)(3) for having arranged for the disposal of a hazardous substance, however, because its voiding of the secured creditor exemption, coupled with its holding of a deed to secure debt, renders Fleet an owner of the site at issue.

## I. BACKGROUND SUMMARY

The Government brought this action to recover the cost of conducting an environmental response action at the Swainsboro Print Works ("SPW") in Swainsboro, Georgia.[4] As a textile printing plant, SPW typi-

1. The findings of fact stated from the bench on February 19, 1993, are hereby incorporated in this Memorandum as if fully set forth herein. Consequently, this Memorandum satisfies the requirements of Fed.R.Civ.P. 52(a) ("[i]n all actions tried upon the facts without a jury ... the court shall find the facts specifically and state separately its conclusions of law thereon ..").

2. Fleet formerly operated under the name Ambassador Factors Corporation.

3. The liability of Clifford Horowitz and Murray Newton is not at issue here because the Government was granted summary judgment as to their

liability. *See United States v. Fleet Factors Corp.,* 724 F.Supp. 955 (S.D.Ga.1988) (granting summary judgment against Horowitz and Newton as to liability), *aff'd and aff'd on other grounds,* 901 F.2d 1550 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). Consequently, the only issues remaining with respect to Horowitz and Newton concern damages.

4. This background summary is included to provide an overview of the factual and procedural history. The statement from the bench on February 19, 1993, constitutes the findings of fact for purposes of Fed.R.Civ.P. 52(a). A transcript of

cally received unfinished cloth ("grey goods") from its customers, bleached that cloth, and dyed or printed patterns in accordance with customers' instructions.[5] When finished cloth emerged from SPW's plant, SPW shipped it back to the customers. Customers typically retained ownership of the cloth during processing, and SPW was paid for its processing services. In some instances, however, SPW owned the cloth and sold the finished product on the open market. Clifford Horowitz served as SPW's president, and Murray Newton served as vice-president—the two were SPW's sole stockholders.

In 1976, Fleet entered into a standard factoring agreement with SPW. Pursuant to that agreement, Fleet advanced funds against SPW's accounts receivable and took a security interest in SPW's real property, inventory, equipment, and machinery. Fleet stayed in close contact with SPW concerning SPW's accounts, clients, projected sales, and the general business climate.

In August 1979, SPW filed for debtor relief under Chapter 11 of the United States Bankruptcy Act and continued operations as a debtor-in-possession. With court approval, Fleet continued to advance funds to SPW. When SPW's debt to Fleet exceeded the value of SPW's accounts receivable, Fleet discontinued advancing funds, and, on February 27, 1981, SPW ceased operations. Salable cloth, equipment, machinery, and chemicals remained at the SPW plant, however. SPW, with Fleet's assistance, retained a skeleton crew to pack and ship the cloth left on-site and to provide site security. Fleet advanced funds during this winding-down period to cover utilities and the skeleton crew's payroll.

On May 13, 1982, the United States Bankruptcy Court for the Southern District of New York entered a Stipulation and Order lifting the stay against lien enforcement and authorizing Fleet to foreclose on the SPW inventory, equipment, and machinery. *See In re: Swainsboro Print Works, Inc.*, No. 79 B 1521, slip op. (Bankr.S.D.N.Y. May 13,

1982) ("Stipulation and Order"). Thereafter, Fleet employed Baldwin Industrial Liquidators, Inc., ("Baldwin") to auction the SPW equipment and machinery. In preparation, Baldwin grouped the salable items into lots and readied SPW's plant for public access. The items were sold "as is, where is" on June 22, 1982. After the auction, Fleet allowed Nix Rigging Company ("Nix") to salvage the remaining equipment and machinery, including most associated wiring and piping, in exchange for Nix leaving the site in a "broom-clean" condition. Nix began its salvage operations immediately, but remained on-site until EPA's arrival in 1984.

The Environmental Protection Agency ("EPA") evaluated the SPW site in January 1984 at the behest of the Georgia Environmental Protection Division. That inspection revealed several hundred drums and numerous vats of CERCLA hazardous chemicals plus asbestos debris. Fleet, Horowitz, and Newton refused EPA's demand to clean-up the SPW site, so EPA conducted a CERCLA removal action and incurred substantial clean-up costs.

Fleet, Horowitz, and Newton denied responsibility for the SPW clean-up costs, and the Government filed this action. The parties' first round of Cross–Motions for Summary Judgment were denied. *United States v. Fleet Factors Corp.*, 724 F.Supp. 955 (S.D.Ga.1988). Fleet appealed. The Eleventh Circuit Court of Appeals affirmed the denial of Fleet's Motion for Summary Judgment and remanded the case for trial. *United States v. Fleet Factors Corp.*, 901 F.2d 1550 (11th Cir.1990) ("*Fleet Factors II* "), cert. denied, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). In its published opinion, the Eleventh Circuit announced a standard for secured creditor liability that stirred the financial community. EPA responded by promulgating a proposed rule interpreting the CERCLA secured creditor liability exemption included in 42 U.S.C. § 9601(20)(A), and this Court stayed the case to await EPA's final rule.

---

such statement has been prepared, reviewed, and filed with the Clerk.

5. The process typically included bleaching, drying, application of special treatments (e.g., for stain resistance), printing, and, finally, packaging for shipment.

Soon after the final rule's April 29, 1992, effective date, *see* 57 Fed.Reg. 18344 (1992), the action was reactivated. The Court subsequently denied a second round of Cross–Motions for Summary Judgment, *United States v. Fleet Factors Corp.*, 819 F.Supp. 1079 (S.D.Ga.1993) ("*Fleet Factors III* "), and this case proceeded to trial. At trial, the Government argued Fleet's liability under 42 U.S.C. § 9607(a)(2) as an "owner or operator" at the time of hazardous substance disposal and under 42 U.S.C. § 9607(a)(3) as having "arranged for" disposal of a hazardous substance.

## II. ANALYSIS

CERCLA is a comprehensive remedial statute [6] with an often-troublesome liability structure. The act's liability provision, codified at 42 U.S.C. § 9607, identifies four categories of "covered persons" to whom CERCLA liability for hazardous substance clean-up attaches:

(1) the owner and operator of a vessel or facility,

(2) any person who at the time of disposal of any hazardous substance *owned or operated any facility* at which hazardous substances were disposed of,

(3) any person who ... *arranged for disposal* or treatment [of hazardous substances] ... *at any facility* ... owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted hazardous substances for transport to disposal or treatment facilities....

42 U.S.C. § 9607(a) (emphasis added).

Courts applying CERCLA have struggled with its provisions and have often explained that the Act's essential purpose is "to force those responsible for creating hazardous waste problems to bear the cost of their actions." *United States v. Bliss*, 667 F.Supp. 1298, 1304 (E.D.Mo.1987) (citing *Violet v. Picillo*, 648 F.Supp. 1283, 1288 (D.R.I.1986)).

Citing legislative history, courts applying CERCLA have found the statute's goal to be "overwhelmingly remedial" and, on that basis, interpreted its provisions liberally in favor of liability.[7] *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340 (9th Cir.1992); *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1557 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752 [112 L.Ed.2d 772] (1991) (citing *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990), and *United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726, 733 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)).

*Fleet Factors III*, 819 F.Supp. at 1083–84 (footnote in original).

As indicated, Fleet's liability under § 9607(a)(2) and § 9607(a)(3) is at issue here. Fleet's § 9607(a)(2) liability is the more complex issue because of a statutory exemption from the definition of the term "owner or operator," *see* 42 U.S.C. § 9601(20)(A), and EPA's recently promulgated regulatory interpretation of that exemption, *see* 40 C.F.R. § 300.1100 ("Lender Liability Rule").

### A. Section 9607(a)(2) "Owner or Operator" Liability

As set forth above, § 9607(a)(2) liability attaches to "any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of...."[8] CERCLA's definition of the term "owner or operator," however, establishes a qualified exemp-

---

**6.** *See* H.R.Rep. No. 1016, 96th Cong., 2d Sess. pt. 1, at 17–22 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6119–25. Congress amended this act in 1986. *See* Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, § 1, 100 Stat. 1613 (1986).

**7.** The standard under CERCLA is strict liability, *United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir.1988), and joint and several liability, *Monsanto Co.*, 858 F.2d at 171; *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 810–11 (S.D.Ohio 1983).

**8.** The Government bears the burden of proving Fleet's liability under § 9607(a)(2) and § 9607(a)(3). *See United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1378–79 (8th Cir. 1989).

tion for any person "who, *without participating in the management* of a vessel or facility, holds indicia of ownership primarily to protect its security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A) ("Secured Creditor Exemption") (emphasis added). The two principal questions concerning Fleet's liability under § 9607(a)(2) as an owner or operator are whether the Secured Creditor Exemption protects Fleet from liability, and, if not, whether hazardous substances were disposed of at SPW while Fleet acted as an owner or operator.

### 1. Secured Creditor Exemption

CERCLA does not elaborate on the Exemption beyond the one-sentence statement in § 9601(20)(A); however, EPA's Lender Liability Rule provides guidance by synthesizing earlier case-law and providing a framework within which the Exemption's coverage may be analyzed. *Fleet Factors III*, 819 F.Supp. at 1085. The Lender Liability Rule defines and expounds on the Exemption's key phrases—"indicia of ownership," "primarily to protect a security interest," and "participation in management," *see* 40 C.F.R.

§ 300.1100(a)–(c)—and identifies a range of specific activities that do not void the Exemption's coverage.

The rule accomplishes the latter task by subdividing a secured creditor's actions into four categories: (1) actions at the inception of the loan or other transaction, (2) policing of the loan, (3) work-out, and (4) foreclosure and post-foreclosure activities.[9] The rule also establishes a [two-prong] general test for "participation in management" that applies to the first three categories. *See* 40 C.F.R. § 300.-1100(c)(1) ("General Test"). For the fourth category, foreclosure and post-foreclosure, the rule devotes a separate subsection to establishing a framework of permissible activities; however, to avail itself of the foreclosure provisions, a secured creditor must not have "participated in management," as defined by the General Test, prior to foreclosure.[10]

*Fleet Factors III*, 819 F.Supp. at 1086–87 (footnotes in original).[11] Fleet bears the burden of showing it is protected by the Secured Creditor Exemption, *Fleet Factors II*, 901 F.2d at 1555–56,[12] and the Secured Creditor

---

**9.** *See generally* Preamble to the Lender Liability Rule, 57 Fed.Reg. 18374–82 (providing a thorough and readable explanation of the Lender Liability Rule's provisions).

**10.** EPA explained the Rule's intended function as follows:

The Agency is issuing this rule to define and interpret the provisions of sections 101(20) and 101(35) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) ... as they affect persons maintaining indicia of ownership in a facility primarily to protect a security interest, which includes private and governmental lending institutions or entities, or which guarantee loans secured by a facility contaminated by or containing hazardous substances, or which acquire title to or ownership of contaminated property by an involuntary transfer or acquisition.

57 Fed.Reg. at 18344. *See also id.* at 18346 (elaborating).

**11.** Under the General Test:

A holder [secured creditor] is participating in management, while the borrower is still in possession of the vessel or facility encumbered by the security interest, only if the holder either:

(i) Exercises decisionmaking control over the borrower's environmental compliance, such that the holder has undertaken responsi-

bility for the borrower's hazardous substance handling or disposal practices; or

(ii) Exercises control at a level comparable to that of a manager of the borrower's enterprise, such that the holder has assumed or manifested responsibility for the overall management of the enterprise encompassing the day-to-day decisionmaking of the enterprise with respect to:

(A) Environmental compliance or

(B) All, or substantially all, of the operational (as opposed to financial or administrative) aspects of the enterprise other than environmental compliance.

40 C.F.R. § 300.1100(c)(1).

**12.** The Lender Liability Rule's introductory comment that "[t]he plaintiff bears the burden of establishing that the defendant is an owner or operator," 40 C.F.R. § 300.1100, creates some confusion as to who bears the burden of showing the Exemption's coverage. Clarification is found, however, in the cases cited by *Fleet Factors II* in which the following general rule of statutory construction is set forth: the party relying on an exception to a statutory prohibition bears the burden of showing that it falls within the exception. *See United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 578 (D.Md. 1986) (applying rule to CERCLA secured creditor exemption and citing *United States v. First City*

Exemption must be construed narrowly, *Id.*, 901 F.2d at 1557 (noting narrow construction to be given Secured Creditor Exemption).[13]

■ Under the Rule, a secured creditor forfeits the Exemption's protection by either holding ownership indicia other than primarily to protect a security interest or by participating in management. Ownership indicia are held primarily to protect a security interest when they are held "primarily for the purpose of securing payment or performance of an obligation." 40 C.F.R. § 300.1100(b).

> Primarily to protect a security interest does not include indicia of ownership held primarily for investment purposes, nor ownership indicia held primarily for purposes other than as protection for a security interest. A holder [secured creditor] may have other, secondary reasons for maintaining indicia of ownership, but the primary reason why any ownership indicia are held must be as protection for a security interest.

Section 300.1100(b)(2). Because the evidence at trial showed Fleet's principal motivation in holding ownership indicia was to protect its security interest, the question reduces to whether Fleet's level of involvement at SPW rose to impermissible levels. To address this question, three areas of Fleet's involvement at SPW must be explored: (1) the activities Fleet itself undertook before the arrival of Baldwin, (2) the activities of Baldwin (Fleet's agent), and (3) the activities of Nix (another of Fleet's agents).[14] As explained below, Fleet is protected for its pre-Baldwin activities, but the activities of Baldwin and Nix void Fleet's protection under the Exemption.

### (a) Pre-Baldwin Period

■ Although Fleet's presence grew noticeably between the cessation of SPW operations and Baldwin's arrival, it did not rise to participation in management. The Government argued at trial that Fleet's actions before Baldwin's arrival violated the General Test's first prong, 40 C.F.R. § 300.-1100(c)(1)(i) (environmental compliance decisionmaking), and its second prong, 40 C.F.R. § 300.1100(c)(1)(ii) (exercise of manager-like control over day-to-day operations). In its attempt to show a violation of the first prong, the Government claimed that Fleet blocked the sale of SPW chemicals and thereby "decided" to allow those chemicals to remain on-site and continue to leak. Whatever the merits of such an argument when fully supported by evidence, it is unpersuasive here because Fleet did not affirmatively block the sale of chemicals. Instead, the evidence at trial showed only that Messrs. Horowitz and Newton felt constrained by Fleet's lien on SPW's chemicals, that one or two requests for permission to sell chemicals were not properly communicated to Fleet, and that their decision not to sell the chemicals was based on Fleet's failure to respond to the miscommunicated requests for permission.[15] Even under the narrow construction appropriately given the Lender Liability Rule, such incidents do not demonstrate Fleet undertook responsibility for the handling or disposal of hazardous substances.

The remaining actions cited by the Government do not establish Fleet's violation of the General Test's second prong—that is, they fail to indicate Fleet assumed manager-like control over SPW's operations. A secured creditor participates in management under prong two of the General Test when it exercises such a level of control over the enterprise that it

> has assumed or manifested *responsibility* for the overall management of the enterprise encompassing the day-to-day decisionmaking of the enterprise with respect to:
>
> (A) Environmental compliance or

---

*Nat'l Bank of Houston*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) (applying rule in banking law context)).

**13.** Of course, the narrow interpretation also applies to 40 C.F.R. § 300.1100, EPA's Lender Liability Rule.

**14.** The principal-agent relationship between Fleet and Baldwin and Nix is undisputed.

**15.** The evidence does not show Fleet acted inappropriately to create or reinforce Mr. Horowitz's or Mr. Newton's impressions.

(B) All, or substantially all, of the operational[16] (as opposed to financial or administrative[17]) aspects of the enterprise other than environmental compliance.

40 C.F.R. § 300.1100(c)(1)(ii) (emphasis and footnotes added).[18] When analyzing a secured creditor's actions under this provision, the Court should consider whether the potentially liable secured creditor exercised control over the enterprise primarily in furtherance of its normal course of business. Furthermore, it is appropriate to ask whether a reasonable, similarly situated secured creditor acting primarily to protect its security interest would have engaged in those actions. *Fleet Factors III*, 819 F.Supp. at 1089–90.[19]

Although neither the Exemption nor the Rule expressly requires consideration of this latter factor, such consideration is warranted to ensure consistency between Congress's intent in creating the Exemption and application of the Exemption. As interpreted by EPA and the Eleventh Circuit, the Exemption was intended to protect banking and lending institutions engaged in their ordinary lending practices. Preamble to the Lender Liability Rule, 57 Fed.Reg. 18344–82, 18366 ("Preamble") (quoting *Fleet Factors II*, 901 F.2d at 1556).[20] In promulgating the Lender Liability Rule, EPA sought to effectuate that intent while also upholding its obligation under CERCLA to recover environmental response costs from those responsible for creating environmental hazards. *See* Preamble, 57 Fed.Reg. at 18346 (noting competing interests EPA sought to address through the Lender Liability Rule).

More specifically, EPA issued the Lender Liability Rule "to define and specify the range of permissible actions" secured creditors may engage in without voiding the Exemption. *Id.* The Rule does identify certain specific permissible activities; however, EPA recognized that every possible activity could not be included in the Rule, because the Rule applies to so many different types of financial transactions. *Id.*, 57 Fed.Reg. at 18357. To compensate, EPA crafted the General Test "as a framework within which to assess the consistency of a holder's [secured creditor's] actions with section 101(20)(A)." *Id.*

The General Test is an invaluable tool for applying the Rule, but it must not be applied blindly; the Exemption's intended function must be kept in sight. Unfortunately, no bright-line test exists for deciding whether a secured creditor is acting in the normal course of its business. Indeed, the variety of transactions within the Rule's embrace makes creation of such a test impossible. Consideration of what a reasonable, similarly situated secured creditor would have done provides critical insight into whether a particular secured creditor's actions were in the normal course of its business. Consequently, when applying the General Test, it is appropriate to ask whether a reasonable secured

---

**16.** "Operational aspects of the enterprise include functions such as that of facility or plant manager, operations manager, chief operating officer, or chief executive officer." 40 C.F.R. § 300.1100(c)(1)(ii)(B).

**17.** "Financial or administrative aspects include functions such as that of credit manager, accounts payable/receivable manager, personnel manager, controller, chief financial officer, or similar functions." 40 C.F.R. § 300.1100(c)(1)(ii)(B).

**18.** *See generally Fleet Factors III*, 819 F.Supp. at 1089–91 (discussing application of Rule's preforeclosure provisions to Fleet's actions; emphasizing that control must extend beyond merely financial and administrative aspects *and* be so pervasive as to demonstrate responsibility for items specified in 40 C.F.R. § 300–1100(c)(1)(i–ii)).

**19.** As noted in *Fleet Factors III*:

> Given EPA's and the Eleventh Circuit's recognition [in *United States v. Fleet Factors Corp.*, 901 F.2d 1550 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752 [112 L.Ed.2d 772] (1991)] that the Secured Creditor Exemption is intended to protect secured creditors engaged in the normal course of their business, consideration of this [participation in management] issue should include whether a reasonable factor facing Fleet's circumstances and acting primarily to protect its security interest would have engaged in the actions undertaken by Fleet.

*Fleet Factors III*, 819 F.Supp. at 1089–90 (noting also that such an interpretation is consistent with the Lender Liability Rule and not an abrogation of its provisions).

**20.** *See also* Preamble at 18376 ("To the greatest extent possible, ... this final rule is intended to protect 'lenders from being exposed to CERCLA liability for engaging in their normal course of business ...'") (quoting *Fleet Factors II*, 901 F.2d at 1556).

creditor acting primarily to protect its security interest would have engaged in the activities at issue.

Applying the standard set forth above, Fleet did not violate the General Test's second prong—that is, it did not exercise manager-like control over substantially all operations at SPW as contemplated in 40 C.F.R. § 300.1100(c)(1)(ii). According to the Government, Fleet voided the Exemption in this pre–Baldwin period because Fleet was the only force present after the SPW shut-down. In support, the Government identified specific acts that allegedly showed Fleet had "complete control" over the SPW plant site. The cited actions arise primarily from Fleet's efforts to ship and sell the twenty to twenty-five million yards of grey goods and finished cloth remaining at SPW's Swainsboro plant after the plant ceased operations, and from Fleet's efforts to collect on the accounts receivable for those goods.[21] Between the cessation of SPW's normal production operations and Baldwin's arrival, Fleet wired funds into SPW's payroll account (to allow payment of the skeleton crew left on-site to package and ship the remaining inventory); paid certain SPW bills directly (primarily because the creditors refused to accept SPW checks); participated in the resolution of customer disputes concerning cloth shipped; and pre-approved all goods shipments (to avoid shipment to customers with delinquent accounts), credit terms, and price terms.[22]

There were no Fleet employees on-site in Swainsboro.

While it is true Fleet was the only entity making affirmative decisions at the SPW plant after its shut-down,[23] Fleet's actions fall within the General Test's embrace because they were tailored to disposing the cloth remaining at SPW and were consistent with those a reasonable, similarly situated secured creditor probably would have taken. When SPW ceased normal production operations in February 1981, Fleet found itself with an insolvent, non-operating debtor. Not surprisingly, Fleet sought to mitigate its losses by shipping and selling the SPW collateral, including a portion of the grey goods and finished cloth at the SPW site. Under the circumstances, however, Fleet could do so only by providing payroll funds for the packaging and shipping crew and making certain other arrangements to facilitate shipping and ensure payment for goods shipped.[24]

In arranging for the shipment of the remaining SPW inventory, Fleet engaged only in activities reasonably related to accomplishing that task. Also, to the extent practicable, Fleet acted as an outsider interested only in seeing the inventory sold.[25] Considering Fleet's actions in context and applying the standards noted above, Fleet's level of control between February 1981 and Baldwin's arrival did not constitute manager-like con-

---

21. The cloth left on-site after the SPW plant closed included both goods owned by SPW customers and goods owned by SPW itself. Fleet shipped the customer-owned goods so it could collect the accounts receivable for SPW's processing work. Also, Fleet generated additional funds by selling the SPW-owned goods on the open market.

22. The Government also pointed to Fleet's use of SPW's employer identification number on tax forms, its involvement with tax deposit reports, and its giving of tax advice to SPW. However, Fleet's potential liability for two or three times the taxes due gave it every reason to take such actions. Accordingly, those actions are consistent with the Exemption. Cf. *Kelley v. Tiscornia*, 810 F.Supp. 901 (W.D.Mich.1993) (bank's involvement in financial affairs—including labor dispute memoranda, "close monitoring" of business, daily monitoring of financial status, and demands for management changes—did not void Exemption).

23. Although Mr. Newton exercised some decisionmaking control at the plant in the few weeks after shut-down, his presence was so short-lived that it warrants only this footnote.

24. In other words, Fleet's options in February 1981 were to make those arrangements and thereby mitigate its losses or to refrain and allow the inventory to deteriorate.

25. See *Fleet Factors III*, 819 F.Supp. at 1087–88 (elaborating on the Rule's actual involvement requirement by explaining the distinction "between a secured creditor who, acting as an outsider, can exercise even considerable influence over a borrower [no liability] from one who *actually exercises* decisionmaking control over the facility's operations from *within the facility's hierarchy* [liability attaches].…' Preamble, 57 Fed.Reg. at 18359 (emphasis supplied)").

trol and was consistent with 40 C.F.R. § 300.1100(c)(1)(ii).

#### (b) Post-Foreclosure: Baldwin and Nix

■ Baldwin's and Nix's actions must be considered under the Rule's foreclosure provisions. As noted above, the Rule includes two standards by which secured creditors actions are measured—the General Test and the foreclosure provisions. The foreclosure provisions are found in 40 C.F.R. § 300.-1100(d) ("Foreclosure Provisions") and are invoked by "foreclosure or its equivalents." In keeping with the intended functions of the Exemption, the Rule, and the Foreclosure Provisions, Baldwin's arrival at the SPW site invokes the Foreclosure Provisions. Also, although Baldwin's auction preparation activities are protected, its handling of hazardous substances and Nix's actions are not.

In certain respects, the term "Foreclosure Provisions" is a misnomer because coverage is not limited to situations where judicial foreclosure proceedings are completed. Instead, they apply to "foreclosure and its equivalents:"

> [T]he term "foreclosure and its equivalents" includes purchase at foreclosure sale "... or *any other formal or informal manner* (whether pursuant to law or under warranties, covenants, conditions, representations or promises from the borrower) *by which the holder [secured creditor] ac-*

*quires title to or possession of the secured property.*"

§ 300.1100(d)(1) (emphasis added). Admittedly, EPA's inclusion of informal means by which possession of secured assets is acquired renders the definition of "foreclosure and its equivalents" a broad one. Such a broad definition is warranted, however, to effectuate Congress's intent that secured creditors be protected in the normal course of their business.[26]

Baldwin's entry onto the SPW site falls within the broad definition of foreclosure and its equivalents because it constitutes Fleet's taking possession of SPW's assets for liquidation and was consistent with normal lending practices. When Baldwin entered SPW, it took effective possession of the equipment, machinery, and inventory; however, it did not undertake judicial foreclosure proceedings against those assets.[27] Instead, Fleet conducted an extra-judicial repossession, as authorized under Ga.Code Ann. § 11–9–503 (codifying Uniform Commercial Code § 9–503).[28]

Despite the absence of judicial foreclosure proceedings, assigning the date of Baldwin's entry as the date of foreclosure for purposes of § 300.1100(d) is consistent with the intended functions of the Exemption, the Rule, and the Foreclosure Provisions. This is true because extra-judicial repossession is as much a normal practice of lenders as judicial fore-

---

26. *Cf.* Preamble, 57 Fed.Reg. at 18377 ("Under this [R]ule, ... [any] informal manner by which the holder acquires possession of the borrower's collateral for subsequent disposition in partial or full satisfaction of the underlying obligation ... [is protected]").

27. Although Baldwin took possession of the SPW real estate as well as the SPW machinery, equipment, and inventory, Baldwin's actions are an equivalent to foreclosure only as to the machinery, equipment, and inventory. Secured creditors are allowed additional latitude under the Foreclosure Provisions because, when a debtor defaults, secured creditors often must take control of the debtor's assets for liquidation. Such loss mitigation efforts are a normal part of what lenders do, so the Foreclosure Provisions allow for the necessary increased involvement.

  Here, Fleet sent Baldwin to SPW to liquidate the machinery, equipment, and inventory only. Fleet had no intention of selling the SPW real estate; consequently, its taking possession of the real estate bears no relation to the Foreclosure

Provisions' intended function (except that it was incidental to the liquidation of other assets) and therefore does not qualify as an equivalent to foreclosure as to the real estate. Despite this conclusion, however, the Foreclosure Provisions still apply to Fleet's foreclosure on SPW's other assets. *Fleet Factors III*, 819 F.Supp. at 1091–92 (it is consistent with a secured creditor's normal course of business to liquidate select assets only, so there is no reasonable basis for requiring that "foreclosure or its equivalents" be directed against real estate).

28. Under § 11–9–503, following a debtor's default, a secured creditor may take possession of secured assets without the permission of or giving notice to the debtor, so long as there is no breach of the peace during repossession. *See generally Ford Motor Credit Co. v. Hunt*, 241 Ga. 342, 245 S.E.2d 295 (1978) (applying statute); *Fidelity Nat'l Bank v. Wood*, 178 Ga.App. 171, 342 S.E.2d 350 (1986) (same).

closures, and Congress intended to protect secured creditors engaged only in the normal of their business, Preamble, 57 Fed.Reg. at 18366 (quoting *Fleet Factors II,* 901 F.2d at 1556). Assigning any other date as the date of foreclosure would require a wooden reading of EPA's definition of foreclosure and its equivalents and would unduly restrict secured creditors.[29]

The permissible post-foreclosure actions are outlined in § 300.1100(d)(2):

A holder [secured creditor], who did not participate in management prior to foreclosure or its equivalents, may ... wind up operations,[30] ... and take measures to preserve, protect or prepare the secured asset prior to sale or other disposition. The holder may conduct these activities without voiding the exemption, subject to the requirements of 40 C.F.R. 300.-1100(d)(1) and 300.1100(d)(2).

§ 300.1100(d)(2) (footnote supplied).[31] Because Fleet satisfies the threshold requirement of not participating in management before foreclosure, it is appropriate to consider whether Baldwin's and Nix's actions are consistent with § 300.1100(d)(2).

When Baldwin entered the SPW plant, it straightened-up the site, grouped (or "lotted") items for sale, and moved drums containing hazardous substance to more secluded areas of the plant so they would not interfere with public access during the liquidation auction. Applying the Foreclosure Provisions to Baldwin's straightening-up of the site and lotting of items for sale, those actions are protected because they fall squarely within § 300.1100(d)(2).

Baldwin's handling of the drums, however, is not a protected activity. In its Preamble to the Rule, EPA notes that after foreclosure or its equivalents a secured creditor may act "to prevent a future release (such as by the removal of drummed waste), or to otherwise prepare property for safe public access incident to sale or liquidation of assets." Preamble, 57 Fed.Reg. at 18379. Elaborating on this point, however, EPA added that such activities are consistent with holding indicia of ownership primarily to protect a security interest *only* if done in accordance with 42 U.S.C. § 9607(d)(1)—in other words, only if done in accordance with the National Contingency Plan ("NCP") or under the supervision of an NCP on-scene coordinator. *Preamble,* 57 Fed.Reg. at 18379. Although done in preparation for the auction, Baldwin's moving of several hundred damaged, corroded, leaking drums is not protected by the Foreclosure Provisions because it was not consistent with the NCP or done under the supervision of an NCP on-scene coordinator.

In opposing its liability for Baldwin's handling of hazardous substances, Fleet argued

---

**29.** Several points concerning the date of foreclosure warrant further comment. During the lengthy pretrial proceedings in this case, neither Fleet, the Government, nor the Court questioned use of the Stipulation and Order's date as the date of foreclosure. At trial, the parties were directed to and did offer arguments concerning alternative dates. Based on those arguments and evidence before the Court, the February 19, 1993, findings of fact identified the last day of Baldwin's · auction as the date of foreclosure. After further reflection and as explained more fully in the text of this Opinion, however, it became apparent that date was inappropriate as well. Accordingly, the February 19, 1993, findings of fact are hereby amended by substituting the date of foreclosure identified in this Opinion for the date noted in the findings of fact.

Identification of the appropriate date of foreclosure is also slightly complicated because, by taking possession a short time (apparently less than two weeks) before entry of the Stipulation and Order, Baldwin was in violation of the stay against lien enforcement. Under the circum-

stances, however, that does not affect the § 300.-1100(d) date of foreclosure because Baldwin's slightly premature repossession of assets was entirely consistent with the expectations of all involved—including SPW's trustee in bankruptcy—and its early arrival caused no problems between Fleet, SPW, and the Bankruptcy Court. Consequently, the date of the Stipulation and Order does not affect the § 300.1100(d) date of foreclosure.

**30.** " 'Winding up' in the post foreclosure context includes those actions that are necessary to close down a facility's operations, secure the site, and otherwise protect the value of the foreclosed assets for subsequent sale or liquidation." Preamble, 57 Fed.Reg. at 18379. "Such activities are considered part of what 'lenders [do when] engaging in their normal course of business.' " *Id.* (quoting *Fleet Factors II,* 901 F.2d at 1556).

**31.** For a thorough discussion of the Lender Liability Rule's foreclosure provisions, see Preamble, 57 Fed.Reg. 18377–79.

that allowing such a result would eviscerate the Foreclosure Provisions' protection. Fleet noted that preparing any manufacturing facility for liquidation requires handling at least *some* hazardous substances because "the term 'hazardous substances' is so broadly defined that it includes more than 1,000 chemicals." Fleet's concerns are understandable, but its argument is unpersuasive because mere incidental handling of hazardous substances does not void the Exemption.

■ Although CERCLA imposes strict liability irrespective of the quantity of hazardous substances in issue, the focus here is on whether, without participating in management, Fleet held ownership indicia primarily to protect its security interest, *see* 42 U.S.C. § 9601(20)(A). Accordingly, handling hazardous substances should violate the Foreclosure Provisions' standard only when such handling indicates either participation in management or the holding of ownership indicia other than primarily to protect a security interest.[32] When hazardous substances are readily identifiable as such, are present in significant quantities, and are in such a condition that the environmental threat they pose is apparent, the handling of those substances indicates impermissible participation in management unless it is done in accordance with 42 U.S.C. § 9607(d)(1).

Two points concerning this conclusion deserve discussion. The first is EPA's failure to explain in its Preamble comment that handling hazardous substances without complying with § 9607(d)(1) may also indicate participation in management—the comment states only that such activity indicates hold-

ing ownership indicia other than primarily to protect a security interest. Quite simply, that omission is not controlling because, as suggested by the context, EPA likely did not intend the comment to articulate a fully developed analysis of post-foreclosure hazardous substance handling. The comment merely indicates EPA's intent that, at least in some circumstances, the post-foreclosure handling of hazardous substances may void the Exemption.

The second point deserving discussion is the use of participation in management as a basis for voiding the Exemption in the post-foreclosure context. After foreclosure, a secured creditor may become intimately involved with a facility's operations without losing protection under the Exemption. *See* § 300.1100(d)(2) (identifying broad range of permissible activities). Such involvement, however, is protected only if it is incident to those actions authorized in § 300.1100(d)(2) and consistent with CERCLA's underlying principles.[33] To the extent a secured creditor exceeds those bounds, it engages in impermissible post-foreclosure participation in management.

Baldwin's handling of the SPW chemical drums rises to impermissible post-foreclosure participation in management because the environmental threat posed by the drums was apparent and serious. As noted, there is no question that Baldwin's handling of the drums was directly related to its auction preparations—that is, to an activity specifically authorized in § 300.1100(d)(2) of the Foreclosure Provisions. Had those actions

---

**32.** *Cf.* Preamble, 57 Fed.Reg. at 18354–55 (causing a release or threat of release does not void the Exemption unless associated actions rise to participation in management: "[T]he touchstone ... is not whether the holder [secured creditor] causes a release, but whether, viewing the holder's actions as a whole, the holder participates in management ...").

**33.** Reconciling secured creditors' ability to engage in § 300.1100(d)(2) activities with CERCLA's underlying principles requires a delicate touch. The § 300.1100(d)(2) activities are allowed because it is in the normal course of a secured creditors' business to take possession of and liquidate assets to mitigate a debtor's default. The activities outlined in § 300.1100(d)(2) are those typically associated with such mitiga-

tion, so they are covered by the Exemption. When assets may be liquidated with no contact or minimal contact with hazardous substances, application of § 300.1100(d)(2) is simple. However, when secured creditors' post-foreclosure actions directly affect hazardous substances, the Foreclosure Provisions must be applied cautiously. More specifically, courts must balance the Foreclosure Provisions' intended function against CERCLA's aim of effecting the clean-up of environmental hazards—the more the handled substances resemble an environmental hazard (as opposed to, for example, hazardous substances being used as part of an on-going operation), the more likely they may be handled only in accordance with 42 U.S.C. § 9607(d)(1).

merely been incidental handling of small quantities of hazardous substances, Baldwin's handling of the drums would not void the Exemption. The critical factor, however, is that the environmental threat posed by the drums at SPW (a closed facility) was obvious even to a lay observer—the plant was filled with several hundred damaged, corroded, and leaking drums, many of which bore conspicuous labels identifying them as containing hazardous chemicals. In short, those several hundred drums posed precisely the type threat CERCLA is designed to alleviate, and Baldwin's handling falls far short of the incidental handling that must be tolerated to ensure the Foreclosure Provisions serve their intended function.

Nix's actions also void Fleet's protection under the Exemption for at least three reasons: (1) Nix handled hazardous substances in an impermissible manner, (2) it seriously aggravated a conspicuous environmental hazard, and (3) it failed to complete its salvage operations in a reasonably expeditious manner. Under its agreement with Fleet, Nix was allowed to salvage any equipment and machinery remaining after the liquidation auction in exchange for leaving the site in a "broom-clean" condition. Unfortunately, as noted at trial, Nix undertook its task with all the finesse of a Viking raiding party. More specifically, Nix haphazardly shoved the drums of chemicals about the site to make way for salvage operations, backed into and crushed the drums with tractors, scraped (and chopped with hatchets) asbestos-laden insulation from equipment and machinery, and allowed that insulation to accumulate on the floor with other miscellaneous rubbish. Nix also failed to complete its task within a reasonable time—it remained on the site for over eighteen months after the liquidation auction.

Nix's handling of the chemical drums and asbestos-laden insulation constitutes impermissible handling of hazardous substances for precisely the same reasons Baldwin's handling of the drums constitutes such action. While Nix's handling of hazardous substances was related (at least tangentially) to actions authorized in § 300.1100(d)(2),[34] the environmental hazard posed by the chemical drums and asbestos-laden insulation was as obvious—if not more so—when Nix entered the site as it was when Baldwin arrived. Therefore, Nix's handling of the SPW chemical drums and asbestos-laden insulation constitutes impermissible post-foreclosure participation in management and voids Fleet's protection under the Exemption.[35]

Although related to its handling of hazardous substances, Nix's severe aggravation of SPW's environmental problems provides a second basis for voiding the Exemption. Like handling hazardous substances or causing a release or threat of release at a facility, aggravating a site's environmental problems should void the Exemption only if it indicates participation in management or the holding of ownership indicia other than primarily to protect a security interest. When a secured creditor (or its agent) undertakes action that it knows or reasonably should know will severely aggravate a site's environmental problems, however, such action constitutes decisionmaking control concerning hazardous substances that rises to impermissible participation in management even under the Foreclosure Provisions. Although the Rule protects a secured creditor who takes possession of assets, continues operations, and liquidates those assets, it does not give *carte blanche* to carelessly dismantle a site or the assets found there when doing so will cause severe hazardous substance problems or severely aggravate existing ones.

As alluded to above, Nix's attack on the SPW plant severely aggravated the environmental problems at SPW. There is no question Nix should have known at least that its harsh treatment of the deteriorating drums of chemicals and haphazard care for the asbestos-laden insulation would drastically compound the environmental threat posed by

---

**34.** Fleet's exchange of the remaining equipment and machinery for clean-up of the SPW plant was not a typical liquidation sale, but it was related to Fleet's disposal of the remaining assets.

**35.** Of course, Nix's handling of the hazardous substances in accordance with § 9607(d)(1) would have preserved Fleet's protection under the Exemption.

the SPW plant. Nix's decision to proceed despite that fact constitutes hazardous substance decisionmaking control that rises to participation in management even in the post-foreclosure context.

By failing to complete its job and vacate the SPW plant in a reasonably expeditious manner, Nix established a third basis for voiding Fleet's protection under the Exemption.[36] This third basis arises from secured creditors' obligation to exercise no more control over unforeclosed-on property than is necessary to dispose of the foreclosed-on assets. As recognized in *Fleet Factors III*, when secured creditors foreclose on only a portion of a debtor's assets, "the extent of control exercised over the unforeclosed-on ... property should be limited to that necessary for protection and disposal of the foreclosed-on assets." *Fleet Factors III*, 819 F.Supp. at 1091.

When, as here, the real property is not foreclosed on, "the secured creditor's control over the unforeclosed-on real property should be limited both as to scope—only over those portions of the real property necessary for protection and disposal of foreclosed-on assets[37]—and time—the real property must be vacated in a reasonably expeditious manner." *Id.*, 819 F.Supp. at 1091 (footnote in original).[38] What qualifies as "reasonably expeditious" must be fleshed-out on a case-by-case basis, but Nix's presence at the SPW plant over eighteen months after Baldwin's liquidation auction unquestionably was not a reasonably expeditious departure. Therefore, Nix exercised excessive post-foreclosure control over the SPW plant that rises to participation in management and provides an additional basis for voiding the Exemption.

### 2. Disposal

■ Because Fleet does not qualify for the Secured Creditor Exemption, the next question concerning Fleet's 42 U.S.C. § 9607(a)(2) liability is whether there was a disposal of any hazardous substance while Fleet owned or operated the SPW plant. In 42 U.S.C. § 9601(29), CERCLA defines the term "disposal" by incorporating the definition provided in the Solid Waste Disposal Act, 42 U.S.C. §§ 6901–92. As set forth in the Solid Waste Disposal Act:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any water, including ground waters.

42 U.S.C. § 6903(3). Applying this definition, Baldwin disposed of hazardous waste when it deposited the dilapidated SPW chemical drums in secluded areas of the SPW plant and when, while moving the drums, it ruptured one and spilled its contents. Similarly, Nix disposed of hazardous waste when it spilled the contents of numerous SPW chemical drums (by knocking over and by crushing those drums), when it scraped asbestos-laden insulation from equipment and machinery in the SPW plant, and when it scattered the asbestos-laden insulation throughout the site. Consequently, Fleet is liable under § 9607(a)(2).

■ Two points alluded to at trial deserve elaboration here. First, disposal may occur even though the potentially liable party did not introduce the disposed of substances to

---

**36.** This basis for voiding the Exemption must be distinguished from the provision in § 300.-1100(d)(1) concerning secured creditors' obligation to undertake asset divestment efforts in a reasonably expeditious manner. The timely-action proviso in § 300.1100(d)(1) addresses secured creditors' post-foreclosure holding of assets for investment purposes—that is, for reasons other than primarily to protect a security interest. In contrast, Nix's failure to vacate SPW in a timely manner indicates impermissible control that rises to participation in management. The distinction is subtle but significant.

**37.** *Cf.* Preamble, 57 Fed.Reg. at 18378–79 (noting the propriety of taking several actions with respect to a facility "to protect or preserve the value of the secured asset").

**38.** *Cf. Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 842–43 (4th Cir.1992) (if it operates a portion of the site, "a defendant operates a 'facility' only if it has authority to control the area where the hazardous substances were located"), *cert denied*, —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992).

the site. *See Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568 (5th Cir.1988) (explaining that the excavation of contaminated soil from one portion of a site and subsequent dispersal of that soil on another portion of the same site constitutes a disposal under CERCLA); *Kaiser Alum. & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338 (9th Cir.1992) (same). As explained by the Ninth Circuit:

> CERCLA's definition of "disposal" expressly encompasses the "placing of any ... hazardous waste ... on any land." 42 U.S.C. § 6903(3) [as incorporated into CERCLA by 42 U.S.C. § 9601(29)]. Congress did not limit the term to the initial introduction of hazardous material onto property. Indeed, such a crabbed interpretation would subvert Congress's goal that parties who are responsible for contaminating property be held accountable for the cost of cleaning it up.

*Kaiser*, 976 F.2d at 1342–43 (following *Tanglewood*). The only meaningful distinction between the facts here and those in *Tanglewood* and *Kaiser* is that most of the waste disposed of here was found and disposed of inside a building. While that distinction warrants further discussion below, it does not affect the applicability of *Tanglewood* and *Kaiser*. Accordingly, it is irrelevant in applying the definition of "disposal" that Baldwin and Nix did not introduce to the SPW site the waste they disposed of at that site.

The second point is that disposal may occur inside a building rather than directly to the "outside." The question is whether such an act is a disposal "into or on any land ... so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any water ...," 42 U.S.C. § 6903(3). Although CERCLA provides little direct guidance, the only line of cases addressing this question interprets "disposal" as applying to disposal in-side a building. *See Amland Properties Corp. v. Aluminum Co. of Am.*, 711 F.Supp. 784, 791 (D.N.J.1989) ("the spilling of PCB-containing fluids onto the floor of an industrial plant ... is disposal 'into or on any land or water' within the meaning of CERCLA"); *BCW Assoc. Ltd. v. Occidental Chem. Corp.*, Civ. No. 86–5947, 1988 WL 102641 (E.D.Pa. Sept. 29, 1988) (floors and fixtures of warehouse covered in contaminated dust); *Emhart Indust., Inc. v. Duracell Int'l Inc.*, 665 F.Supp. 549 (M.D.Tenn.1987) (PCBs contaminated industrial building).[39]

Although *Emhart* does not elaborate on its conclusion, *BCW* and *Amland* focus on related provisions in CERCLA and on the § 6903(3) definition itself. The *BCW* court, after citing *Emhart*, explains that "[i]t is clear that Congress intended the term 'land' to encompass buildings and other types of real estate." *BCW*, 1988 WL 102641 at *17. *BCW* buttresses its conclusion by noting 42 U.S.C. § 9607(a)(2) contemplates disposal *at* a facility and that CERCLA's definition of facility includes "any building, structure, [or] installation." *Id.* (citing 42 U.S.C. § 9601(9)). *Amland* embraces the *BCW* rationale and adds that dispersal of hazardous substances outside the building is not necessary because disposal need only be such "that hazardous waste '*may*' enter the environment." *Amland*, 711 F.Supp. at 792 (emphasis added).

The conclusion reached in *Amland*, *BCW*, and *Emhart* is consistent with CERCLA's remedial goals and § 6903(3)'s provision that substances need only be deposited such that they *may* enter the environment. Although neither *Amland* nor *BCW* expressly states the next step in the argument, the meaning is clear: if CERCLA authorizes actions to recover cost for clean-up of facilities (including buildings) and one of CERCLA's central tenets is to make the polluter pay,[40] the term disposal must include actions inside a building. Otherwise, a party could escape liability

---

**39.** *But cf. Allied Towing v. Great E. Petroleum Corp.*, 642 F.Supp. 1339, 1350 (E.D.Va.1986) (injecting hazardous substance into barge not disposal).

**40.** *See Fleet Factors II*, 901 F.2d at 1553 ("The essential policy underlying CERCLA is to place the ultimate responsibility for cleaning up hazardous waste on 'those responsible for problems caused by the disposal of chemical poison' ") (quoting *Florida Power & Light v. Allis Chalmers*, 893 F.2d 1313, 1316 (11th Cir.1990)).

for the costs of cleaning a building (that is, a "facility") when a party is to blame for the pollution.

Furthermore, this conclusion is buttressed by the statutory definition that a disposal occurs when substances are placed on any land such that they "*may* enter the environment or ... the air ... or the water." § 6903(3) (emphasis added). On its face, this definition is broad. More importantly, however, if the phrase "any land" is read so narrowly as to include only the open environment, the latter portion of the definition—such that the substances "*may* enter the environment or ... the air ... or the water"—is mere surplusage. Such a reading violates the settled principle of statutory construction that courts should preserve, not destroy. *See United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955) (cardinal principle of statutory construction is to give effect to every clause and word of statute, rather than emasculate entire section).

Applying this construction of the term disposal, Baldwin's spilling of chemicals from an SPW drum requires little comment—that act constitutes disposal under CERCLA because § 6903(3) specifically includes spilling. Furthermore, under the circumstances, Baldwin's placing of deteriorating drums in the SPW plant's more secluded areas also constitutes disposal. It is true that Baldwin moved the drums to allow safe public access for the liquidation auction. Baldwin did not merely temporarily store the chemicals, however.[41]

Instead, Baldwin discarded the drums in a place where they likely would remain into the indefinite future; the plant was shut-down, the liquidation auction and deteriorated condition of the plant made it apparent that the plant probably would not be used in the near future, and the drums were in poor condition and leaking (caused in large part by exposure to the elements from holes in the plant's roof).[42] In other words, depositing the drums in the SPW plant was as much a disposal as placing them in any waste dump would have been. Had Baldwin deposited the SPW drums in some other waste facility operated by Fleet, such act would be a disposal; consequently, there is no reason to reach a different conclusion here.[43]

Nix's actions constitute disposal for many of the same reasons Baldwin's actions fit within that term's definition. First, by knocking over and crushing the drums, Nix spilled their contents throughout the SPW plant; as with Baldwin, such acts are disposals under CERCLA. Similarly, Nix disposed of asbestos when, by scraping asbestos-laden insulation from equipment and machinery, it dispersed asbestos throughout the SPW plant and into the air. Those acts fall squarely within the definition of disposal. *Accord BCW*, 1988 WL 102641 at *16–17 (dispersal of contaminated dust over floors and fixtures of warehouse constitutes disposal).

In summary, Fleet does not qualify for the Secured Creditor Exemption and the actions of Fleet's agents Baldwin and Nix constitut-

---

**41.** *See United States v. Amtreco, Inc.*, 809 F.Supp. 959, 965–66 (M.D.Ga.1992) (mere storage of chemicals is not disposal under CERCLA; "[t]he term 'storage,' when used in connection with hazardous waste, means the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste") (quoting 42 U.S.C. § 6903(33)).

**42.** *Cf. CP Holdings, Inc. v. Goldberg–Zoino & Assocs., Inc.*, 769 F.Supp. 432, 436 (D.N.H.1991) (sale of asbestos-laden building with knowledge that building would be demolished constitutes disposal).

**43.** *Cf. Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*, 737 F.Supp. 1272, 1278 (W.D.N.Y.1990) (even assuming *arguendo*

that sealed in-ground receptacles were not breached, "depositing hazardous substances into such receptacles nonetheless constitutes 'disposal' [under CERCLA]"), *aff'd*, 964 F.2d 85 (2d Cir.1992).

Furthermore, because of a recent split of authority on whether passive leaking qualifies as disposal, the Court emphasizes that Baldwin's drum disposal rests on its affirmative control over and discarding of the leaking SPW drums. Whether the mere leaking of drums on-site qualifies as disposal is a question for another court, or at least another day. Concerning passive disposal, compare *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir.1992) (disposal includes passive action), with *United States v. Petersen Sand and Gravel, Inc.*, 806 F.Supp. 1346 (N.D.Ill.1992) (disposal does not include passive action).

ed disposal of hazardous substances at the SPW Site. Accordingly, Fleet is liable under 42 U.S.C. § 9607(a)(2).

### B. Section 9607(a)(3) "Arranged for Disposal" Liability

Title 42 U.S.C. § 9607(a)(3) imposes CERCLA liability on any person that "arranged for" the disposal or treatment of hazardous substances at a facility owned by another.[44] Because Baldwin's and Nix's disposal of hazardous substances is addressed above, only two § 9607(a)(3) issues remain: (1) whether Fleet arranged for that disposal and (2) whether Fleet's deed to secure debt renders Fleet the owner of SPW and thereby precludes liability. Although the first issue is resolved against Fleet, the second issue is resolved in its favor; therefore, Fleet is not liable under § 9607(a)(3).

■■■■ CERCLA does not define "arranged for," but courts applying § 9607(a)(3) should interpret that phrase broadly to effectuate CERCLA's remedial goals. *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1318 (11th Cir.1990); *United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726, 733 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). As one commentator noted, courts applying "arranged for" have given it an expansive interpretation "to give effect to [C]ongressional intent that all who participate in the generation and disposal of hazardous wastes should share in cleaning up the harm from their activity." *CPC Int'l, Inc. v. Aerojet–General Corp.*, 759 F.Supp. 1269, 1277 (W.D.Mich.1991) (quoting 2 S. Cooke, *Law of Hazardous Waste* § 14.-01[5][d][ii] ). More specifically, § 9607(a)(3) liability may attach even if the potentially

responsible party did not know where the items would be disposed or if it believed they would be disposed elsewhere. *United States v. Aceto Agric. Chem. Co.*, 872 F.2d 1373, 1381 (8th Cir.1989) (citing *United States v. Ward*, 618 F.Supp. 884, 895 (E.D.N.C.1985)). Section 9607(a)(3) liability may attach even if the potentially responsible party did not intend to dispose of the hazardous substances. *See Aceto*, 872 F.2d at 1380 (rejecting defendants' argument that they could be liable only if they intended to dispose; disposal inherent in process at issue).[45]

■■■■ Despite the expansive reading given § 9607(a)(3), however, its reach is not limitless—§ 9607(a)(3) liability requires that there be a sufficient nexus between the potentially responsible party and the items disposed, *General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir. 1992); this nexus may be established by showing actual involvement in the decision to dispose or by showing an obligation to control the hazardous substance. *Id.* Although the undertaking of an obligation to control hazardous substances invokes liability even if the potentially responsible party was not actively involved in "the timing, manner or location of disposal," *CPC Int'l*, 759 F.Supp. at 1279, liability does not attach for the mere ability or opportunity to control disposal, *AAMCO*, 962 F.2d at 286. When analyzing a party's actual involvement in the decision to dispose, the Court is not controlled by the party's characterization of the transaction. *Aceto*, 872 F.2d at 1381.

■■■ Fleet "arranged for" disposal through its agreements with Baldwin and Nix because those agreements necessarily contemplated the disposal of hazardous substances.[46] As explained above, Fleet and

---

**44.** Stated more fully, § 9607(a)(3) imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances ... at any facility ... owned or operated by another party or entity and containing such hazardous substances...."

**45.** *See generally United States v. Bliss*, 667 F.Supp. 1298 (E.D.Mo.1987) (plant supervisor and company's chief executive officer found liable where they made decision to dispose of hazardous substances; broker that acted as "middle man" between chemical manufacturer and dis-

posal company liable where it had authority to choose disposal facility to be used); *United States v. A & F Materials Co., Inc.*, 582 F.Supp. 842 (S.D.Ill.1984) (corporation liable where it handed hazardous substances over to third party and third party disposed of those hazardous substances in its waste facility).

**46.** *See Aceto*, 872 F.2d at 1381 (pesticide manufacturers liable under § 9607(a)(3) for clean-up at facility to which they sent chemicals for mixing; sending chemicals to facility constituted an arrangement for disposal because mixing neces-

Baldwin agreed that Baldwin would prepare the SPW site for and conduct an auction of SPW's equipment, machinery, and remaining inventory. This agreement did not expressly provide for disposal, but Fleet was aware the site contained large quantities of hazardous substances. Fleet's knowledge of that fact, general familiarity with the site, and knowledge that Baldwin's auction preparation activities necessarily would include some clean-up of the site (to make it safe for public access) indicates Fleet at least should have known Baldwin would handle hazardous substances in completing its task. Furthermore, because of Fleet's awareness that the SPW plant was defunct and deteriorating with holes in the building's roof, Fleet should have known also that even the movement of those hazardous substances to more remote portions of the site would constitute disposal and not mere storage. Consequently, Fleet's engagement of Baldwin to prepare for and conduct an auction at the SPW site was an arrangement for disposal as contemplated in § 9607(a)(3).

■ Similarly, Fleet's agreement with Nix was an arrangement for disposal.[47] Fleet engaged Nix to leave the SPW plant in a "broom-clean" condition in exchange for allowing Nix to salvage the remaining equipment and machinery. Testimony at trial established that "broom-clean" means just what the phrase implies—all items except fixtures removed, and the floors swept.

Therefore, Fleet's directing Nix to leave the site in a "broom-clean" condition coupled with Fleet's knowledge that large quantities of hazardous substances were present on the site is tantamount to Fleet telling Nix to dispose the hazardous substances at SPW. Accordingly, through its agreement with Nix, Fleet made an affirmative decision to dispose hazardous substances and, by doing so, arranged for disposal.[48]

■ Concerning Fleet's ownership of the SPW plant, Fleet argued that it is not subject to liability under § 9607(a)(3) because, as the holder of a deed to secure debt, it owned the SPW plant site.[49] Fleet is correct. The four classes of "covered persons" liable under CERCLA are described in one provision, § 9607(a). Congress enacted § 9607(a) as a whole; therefore, although each classification provides an independent basis for liability, the four classes should be read together as forming a web of liability. To ensure that each classification of § 9607(a) serves its intended function, Congress's § 9601(20)(A) definition of the term "owner" must be applied to § 9607(a)(3) just as it is applied to § 9607(a)(1) and § 9607(a)(2).

Application of the § 9601(20)(A) definition of "owner" to § 9607(a)(2) and § 9607(a)(3) precludes finding Fleet liable under both. The § 9601(20)(A) definition is simple—in the case of an onshore facility, it defines an

---

sarily involved certain amount of spillage at the mixing site). *See also Jones–Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688 (9th Cir.1992) (chemical company liable under § 9607(a)(3) for clean-up at facility to which it sent raw chemicals for mixing; mixing agreement constituted arrangement for disposal when it contemplated at least 2% spillage).

*Compare Aceto* and *Jones–Hamilton* with *Ashland Oil, Inc. v. Sonford Prods. Corp.*, 810 F.Supp. 1057 (D.Minn.1993) (secured creditor not liable under § 9607(a)(3) when it merely acquired title to contaminated facility through foreclosure and promptly divested itself of facility), and *Jersey City Redevelopment Auth. v. PPG Indust.*, 655 F.Supp. 1257 (D.N.J.1987) (mere sale of property containing hazardous substances is not an arrangement for disposal: seller of land contaminated with hazardous substances not liable for clean-up of separate parcel of land when land sold and after sale of land contaminated soil from the parcel sold transferred to separate parcel).

**47.** Fleet did not enter into its agreement with Nix until August 1982, several months after its agreement with Baldwin.

**48.** Fleet probably did not envision that Nix would dispose of those items at the SPW site, but such knowledge is not a requirement for § 9607(a)(3) liability to attach. *See Aceto*, 872 F.2d at 1381 (citing *Ward*, 618 F.Supp. at 895).

**49.** Georgia is a "title theory" state; when a creditor takes a security interest in land it receives actual title to that land through a deed to secure debt. The debtor recovers its title to land by fulfilling its obligations under the loan. *See* Ga. Code Ann. § 44–14–60. For an interesting discussion of the title theory/lien theory distinction in the Secured Creditor Exemption context, see Note, *Cleaning Up the Debris After Fleet Factors: Lender Liability and CERCLA's Security Interest Exemption*, 104 Harv.L.Rev. 1249 (1991).

owner as any person[50] that owns a facility. However, that definition also includes the Secured Creditor Exemption, which excludes any person "who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect its security interest...." 42 U.S.C. § 9601(20)(A). As explained in the preceding sections of this Opinion, the actions of Fleet's agents bring Fleet outside the Secured Creditor Exemption's coverage. Consequently, Fleet's holding of title through its deed to secure debt renders it an owner and thereby precludes finding Fleet liable under § 9607(a)(3).[51]

## III. CONCLUSION

For the reasons stated above, Defendant Fleet Factors Corporation is LIABLE under the Comprehensive Environmental Re-

sponse, Compensation, and Liability Act, 42 U.S.C. §§ 9601–75, as a 42 U.S.C. § 9607(a)(2) owner or operator. It is hereby ORDERED that the United States of America PREPARE A SUMMARY OF COSTS in accordance with the findings stated from the bench on February 22, 1993, at the conclusion of the trial's damages phase and a proposed judgment as to all Defendants. The United States of America shall file its Summary of Costs and proposed judgment before the close of business June 3rd, 1993.

---

**50.** CERCLA defines "person" to include a corporation. 42 U.S.C. § 9601(20)(A).

**51.** As evidence of the interlocking nature of the § 9607(a) classifications, however, had Bald-

win's and Nix's actions not voided the Exemption, Fleet would be protected from liability under § 9607(a)(2) but liable under § 9607(a)(3).