**STATE OF NEW YORK, Plaintiff,**

v.

**ALMY BROTHERS, INC.; Leonard Almy; Louis A. Stilloe; Robert J. McMahon; and Mary A. McMahon, Defendants.**

No. 90–CV–818.

United States District Court, N.D. New York.

Oct. 28, 1994.

---

**16.** The Court has reviewed the other arguments advanced by Serrani and concluded that they are without merit.

G. Oliver Koppell, Atty. Gen., New York State Dept. of Law, Environmental Protection Bureau, Albany, NY, for plaintiff; Maureen F. Leary, Asst. Atty. Gen., of counsel.

Offices of M. Suzanne McMahon, Johnson City, NY, for defendants Robert J. McMahon and Mary A. McMahon; M. Suzanne McMahon, of counsel.

Leonard Almy, pro se.

Butler Allen Clark & Place, Vestal, NY, for defendant Louis A. Stilloe; Earl D. Butler, of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### INTRODUCTION

Presently before the court is plaintiff State of New York's ("the State") motion for partial summary judgment against defendants Leonard Almy and Almy Brothers, Inc. (hereinafter referred to collectively as "the Almy defendants") and Robert and Mary McMahon (hereinafter referred to collectively as "the McMahons") concerning the issue of their liability (1) as responsible parties for the State's response costs pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a) ("CERCLA"); and (2) for abatement of a public nuisance and for restitution pursuant to New York common law. In addition, the McMahons have cross-moved to (1) reopen discovery and (2) to join defendant Louis Stilloe as a defendant in the State's motion for partial summary judgment.

On October 4, 1994, the court heard oral argument in support of, and in opposition to, these motions. At that time, the court issued decisions with respect to certain portions of these motions from the bench. In this regard, the court **granted** the State's motion with respect to the liability of the Almy defendants, who interposed no opposition to the relief sought, for the State's response costs pursuant to CERCLA; **denied** the State's motion with respect to the liability of the Almy defendants and the McMahons pursuant to New York common law of public nuisance and restitution; and **denied** the McMahons' cross-motion to join defendant Stilloe as a defendant in the State's motion for partial summary judgment. The court reserved decision with respect to the remaining issues presented by the parties' respec-

tive motions. This Memorandum–Decision and Order constitutes the court's findings of fact and conclusions of law with respect to these outstanding issues.

## PROCEDURAL BACKGROUND

In July 1990, Louis Stilloe ("Stilloe") commenced a private CERCLA cost recovery action against Almy Brothers, Inc., the McMahons, and the State. Almy Brothers, Inc. and the McMahons counterclaimed against Stilloe and cross-claimed against each other and the State.

The State moved to dismiss all of the CERCLA claims asserted against it. The court denied this motion. *See Stilloe v. Almy Bros., Inc.,* 759 F.Supp. 95 (N.D.N.Y. 1991). Therefore, in April 1991, the State filed an answer in which it asserted counterclaims and cross-claims against Almy Brothers, Inc., Stilloe and the McMahons alleging CERCLA and New York common law public nuisance and restitution causes of action. Thereafter in July 1991, the State filed a motion for reconsideration of its motion to dismiss. Upon reconsideration, the court reversed its earlier decision and dismissed all of the CERCLA claims asserted against the State. *See Stilloe v. Almy Bros., Inc.,* 782 F.Supp. 731 (N.D.N.Y.1992).

In April 1992, Almy Brothers, Inc., Stilloe and the McMahons filed a stipulation of voluntary dismissal pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure. This stipulation was approved by the court and entered by the Clerk. In July 1992, the State advised the court, by letter, that it had not consented to the stipulation of dismissal. Therefore, the State requested that its claims be reinstated. By order dated July 16, 1992, the court vacated the Rule 41(a)(1)(ii) stipulation, instructed the Clerk to reopen the case, and advised the parties to proceed with this action in accordance with the Federal Rules of Civil Procedure and this court's local rules. *See* Order dated July 16, 1992.

On September 21, 1992, the State moved to realign the parties and to amend its complaint to add Leonard Almy as a defendant. On October 13, 1992, the court granted the State's motion. On November 30, 1992, the State filed and served its amended complaint.[1]

At a pretrial conference held on July 5, 1994, the State notified the court of its intent to file a summary judgment motion. Based upon this statement, the court instructed the parties to file any motions they intended to make no later than August 15, 1994. As a result of these instructions, the parties filed the present motions.

## DISCUSSION

### I. Summary Judgment Standard [2]

Recently, the Second Circuit reiterated the well-established principles that govern this

1. As the State noted in its memorandum of law, none of the defendants have filed or served answers to the amended complaint. Therefore, at oral argument the court instructed **all** the defendants to file and serve such answers. At this time, the court further instructs the parties to file and serve these pleadings, if they have not already done so, within 20 days of the date of this Memorandum–Decision and Order.

In addition, the court notes that even though it granted the State's motion for partial summary judgment against the Almy defendants on the issue of liability, these defendants should, nonetheless, file answers to the amended complaint. Moreover, the court repeats its instructions to the Almy defendants that they are to notify the court, in writing, within 60 days of the identity of their counsel. As the court informed Mr. Almy at the July 5, 1994, pretrial conference, he may continue to represent himself but he **cannot** represent Almy Brothers, Inc.

2. As a preliminary matter, the court notes that the papers that the McMahons filed in opposition

to the State's motion do not comply with this court's local rules. In this regard, Rule 7.1(c) provides, in pertinent part, that "[a]n opposing party shall file and serve with the papers in opposition to the motion an answering affidavit and a **memorandum of law.**" Local Rule 7.1(c) (emphasis added). The McMahons did not file the required memorandum of law. In addition, the local rules provide that "[t]he papers opposing a motion for summary judgment shall include a **separate,** short and concise statement of the material facts as to which it is contended that there exists a genuine issue.... All material facts set forth in the statement served by the moving party shall be deemed admitted unless controverted by the statement served by the opposing party...." Local Rule 7.1(f) (emphasis added). Rather than file a **separate** statement, the McMahons included the relevant information in their affidavit. Finally, the local rules provide that "[f]ailure to file any papers as required by this Rule [7.1] **shall,** unless for good cause shown, be deemed by the court as consent to the

court's consideration of a summary judgment motion. In this regard, the Second Circuit stated

> **First,** summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). **Second,** the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. *See Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). In considering that, **third,** all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918 [108 S.Ct. 269, 98 L.Ed.2d 226] (1987). **Fourth,** the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 [106 S.Ct. 2548, 2553, 91 L.Ed.2d 265] (1986); *DiCola v. SwissRe Holding (North America), Inc.,* 996 F.2d 30, 32 (2d Cir.1993). When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. *See Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988).... **Finally,** the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.

*Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (emphasis added).

granting of the motion, ..." Local Rule 7.1(b) (emphasis added).

It is with these guidelines in mind that the court must address the issues raised by the present motions.

## II. CERCLA Liability

The State seeks partial summary judgment against the McMahons on the issue of their liability for the State's response costs pursuant to CERCLA. In opposition, the McMahons argue, in conclusory fashion, that there are genuine issues of material fact which preclude granting the State the relief it seeks.

> In order to establish a prima facie case of CERCLA liability, a plaintiff must prove that (1) the defendant is a responsible party as defined by section 9607(a)(1)–(4); (2) that the site at issue is a "facility" as defined by section 9601(9); (3) that there has been a release of hazardous substances at the facility or that such a release is threatened; (4) that the plaintiff has incurred response costs in connection with that release; and that (5) the costs incurred and the response actions taken conform to the National Contingency Plan set up under CERCLA.

*General Elec. Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 285 (2d Cir.1992) (citing *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2nd Cir.1992)).

Moreover,

> [i]f the [plaintiff] establishes each of these elements on undisputed facts, and the defendant is unable to demonstrate by a preponderance of the evidence the existence of one of the three affirmative defenses set forth in § 9607(b), then plaintiff is entitled to summary judgment on the issue of liability, even when genuine issues of material fact remain as to appropriate damages.

*United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2d Cir.1993) (citing *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989)).

The only element of the State's prima facie case that the McMahons dispute is their status as "responsible parties" within the meaning of § 9607(a)(1)–(4).[3] Section 9607(a) de-

**3.** In their affidavit, the McMahons take issue with paragraph 38 of the State's Statement of

fines a responsible party in the following manner:

> [n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> (1) the owner and operator of a ... facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances, ...
>
> (4) ... [is a responsible party]

42 U.S.C.A. § 9607 (West Supp.1994).[4]

The State contends that the McMahons "[f]all with [sic] a class of liable persons as owners of a facility at the time hazardous substances were disposed there. 42 U.S.C. § 9607(a)(2). In addition, defendant Robert McMahon operated the facility and arranged for the disposal of hazardous substances there. 42 U.S.C. § 9607(a)(2) and (3)." *See* Plaintiff's Memorandum of Law at 18.

### A. Facts [5]

The following facts are uncontroverted. In 1981, the McMahons purchased the site—6, 8, and 10 Jackson Street—from Dairylea Cooperative. *See* Leary Affidavit at ¶ 7 and Exhibit A, 1981 Deed, attached thereto. When Dairylea owned the site, it was used as a milk processing and ice cream manufacturing plant. *See id.* and Exhibit B, Dairylea's Responses to NYSDEC Information Demand at 2–3, attached thereto. On March 2, 1984, the McMahons sold 8 Jackson Street to Leonard Almy. *See id.* at 8 and Exhibit D, Deed to 8 Jackson Street, attached thereto. There were drums located on the 8 Jackson Street property before Almy bought the property. *See id.* and Exhibit C, Almy Trial Transcript at 37–38, attached thereto. Almy would not close on the building until the drums were removed. *See id.* and Exhibit C at 39–40. By the time of the closing in March 1984, the drums had been removed from the 8 Jackson Street property. *See id.* and Exhibit C at 40. Almy later saw the drums elsewhere at the Site. *See id.* and

Uncontested Material Facts. Paragraph 38 provides that "[a]s a result of the disposal and release of hazardous substances at the 6, 8 and 10 Jackson Street properties (the "Site"), the New York State Department of Environmental Conservation ("NYSDEC") was forced to excavate, sample, remove, investigate, remediate and otherwise respond to the Site (Klatt Aff., ¶ 14; Suozzo Aff., ¶¶ 3–10)." *See* Plaintiff's Statement of Uncontested Material Facts at ¶ 38. In response to this statement, the McMahons assert that "[w]hat New York State was 'forced' to do or not to do is probably the most disputed fact in this whole debacle." *See* McMahon Affidavit at ¶ 5e. Contrary to the McMahons' assertion, this statement does not create an issue of fact as to whether NYSDEC incurred response costs in connection with the incidents at issue here.

**4.** Section 9607(b) sets forth the **only** defenses to liability under CERCLA. This section provides, in pertinent part, that

> [t]here shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused **solely** by—
>
> (1) an act of God;

> (2) an act of war;
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or [sic] than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ..., if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
>
> (4) any combination of the foregoing paragraphs.

42 U.S.C.A. § 9607(b) (West 1983) (emphasis added).

**5.** The terms "drums" and "barrels" are used interchangeably throughout this Memorandum–Decision and Order to designate the receptacles that allegedly contained the hazardous substances at issue here. Likewise, the terms "property" and "site" are used interchangeably to refer to the "6, 8 and 10 Jackson Street" parcels of land.

Exhibit C at 42. On February 28, 1987, the McMahons sold the parcel at 6 Jackson Street to Almy. *See id.* at 9 and Exhibit F, Deed to 6 Jackson Street, attached thereto.

On September 8, 1988, the McMahons sold the parcel located at 10 Jackson Street to defendant Louis Stilloe. *See* Leary Affidavit at ¶ 10 and Exhibit G, Deed to 10 Jackson Street, attached thereto. Prior to closing, Stilloe inspected the property and discovered drums and other personal property stored there. *See id.* and Exhibit C, Stilloe Trial Transcript at 66–71, attached thereto. The drums were located on the 10 Jackson Street side of an alleyway that runs between 10 Jackson Street and 8 Jackson Street.[6] *See id.* and Exhibit C at 71 and 79. At the closing on September 8, 1988, the McMahons and Stilloe entered into a written contract whereby the McMahons agreed to remove all "personal property," "debris," and "stored materials" within 15 days of the date of the closing on the property.[7] *See id.* and Exhibit H, McMahon/Stilloe Contract, p. 3, ¶ 2, attached thereto. This contract also provided that

> [I]n the event the [McMahons] have failed to remove said personal property, debris and stored materials or in the event any governmental agency including the Environmental Protection Agency requires additional work on the part of [Stilloe] in connection with the removal of said personal property, debris or stored materials, [Stilloe] may remove the same and the [McMahons] agree to reimburse [Stilloe] for any and all expenses in relation thereto
> · · ·

*See id.* and Exhibit H, p. 3, ¶ 2.

Despite this contract, the McMahons failed to remove the debris and personal property from 10 Jackson Street within 15 days of closing. *See* Leary Affidavit at ¶ 14. Sometime later, however, the drums were moved from the Stilloe building to another location on the Site.[8]

---

6. The condition of these drums is in dispute. The State contends that "[t]he drums were old and in a very poor, deteriorated condition (Exhibit C, Stilloe TT: p. 74). Many were rusting, cracking, and otherwise defective (Exhibit C, Stilloe TT: p. 74)." *See* Leary Affidavit at ¶ 10. To the contrary, the McMahons assert that

> [a]lthough Mr. Suozzo's affidavit states that "The drums removed from Jackson Street were old, rusted and deteriorating", this statement is in direct contradiction to what Mr. Suozzo said when he numbered those same drums at the Jackson Street site on May 9, 1989. In a document attached hereto as EXHIBIT 4, Mr. Suozzo, in his own handwriting identifies only one drum (drum NO. 40) as "rusted drum, not empty". In this document Mr. Suozzo describes each and every one of sixty-one (61) drums at the Jackson Street [sic]. This was the total number of drums following the excavation of May 2 & 3, 1989, an excavation which itself accounted for forty-eight (48) of the sixty-one drums represented in this document. Mr. Suozzo uses this "rusted" characterization to distinguish this one drum (drum NO. 40) from the remaining sixty (60) drums.

*See* McMahon Affidavit at ¶ 5b.

7. The State and the McMahons disagree as to whether the drums at issue here were included within the contract's definition of personal property, debris, and stored materials.

8. The State contends that the drums were moved from the Stilloe side of the alleyway to the Almy side of the alleyway in or about February 1989.

*See* Leary Affidavit at ¶ 14. At his trial, Robert McMahon testified as follows:

> Q. Were the barrels moved during the time that you owned the property from one area to another area within the Jackson Street site?
> A. Yes.
> Q. Did you ever personally move them?
> A. I was there when we were moving them.
> Q. Did you have employees or someone hired by you to—
> A. The employee I had and one of the Almy employees. I had left, so I don't know what went on after that....
> Q. Now, during the time that you owned the property, did you move them from the—let's begin with inside the Almy building. Did you move them from inside the Almy Brothers' to someplace else?
> A. Over here.
> Q. To the Stilloe building?
> A. Right.
> Q. Now they are all together.
> A. Right ...
> Q. The barrels you indicated were moved, is that right, from the Stilloe building to somewhere else?
> A. They were moved down the block, to the end of the block.
> Q. When were the barrels moved from the Stilloe building to the rear of this building that you are describing?
> A. December.
> Q. December of?
> A. '88.

*See* Leary Affidavit at Exhibit C, McMahon Trial Testimony at 430–34.

### B. The McMahons' Liability Under § 9607(a)(2)

Section 9607(a)(2) primarily covers prior owners and operators. "Prior owners and operators are liable only if they owned or operated the facility 'at the time of disposal of any hazardous substance;' ..." *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.1985) (emphasis added). For purposes of CERCLA, "disposal" is defined as "[t]he discharge, deposit, injection, dumping, spilling, leaking, or placing of any ... hazardous waste into or on any land ... so that such ... hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C.A. § 6903(3) (West 1983).[9]

The parties do not dispute the fact that the McMahons owned the site, in whole or in part, between 1981 and September 1988. The gravamen of their disagreement, and the dispositive issue as to the liability of the McMahons under § 9607(a)(2), is whether or not the McMahons owned the property at the time of the disposal of any hazardous substance. To support its argument that such a disposal did occur within the relevant time frame, the State asserts that "[d]rums ultimately found to contain pesticides and other hazardous substances were **stored** at both 8 and 10 Jackson Street during the time the McMahons owned the property." *See* Plaintiff's Memorandum of Law at 20 (citing Leary Aff. ¶¶ 8 and 10) (emphasis added). Furthermore, the State argues that "[w]hen McMahon failed to follow to [sic] through on his written commitment with Stilloe to remove the drums, he **abandoned** them on Stilloe's property and therefore disposed of

them at 10 Jackson Street." *See id.* at 21 (emphasis added).[10] In addition, at oral argument the State asserted that the movement of the drums around the site during the period of the McMahons' ownership constituted a "disposal" for purposes of CERCLA liability.

The McMahons do not address the "disposal" issue directly. Rather, their opposition to the State's motion is based upon their assertion that because the drums were on the property when they purchased it from Dairylea they are not liable for any damage which might have occurred as a result of the drums' mere presence at the site during the period of the McMahons' ownership.[11]

CERCLA is a comprehensive remedial statute. Nonetheless,

[c]ourts applying CERCLA have struggled with its provisions and have often explained that the Act's essential purpose is "to force those responsible for creating hazardous waste problems to bear the cost of their actions." *United States v. Bliss*, 667 F.Supp 1298, 1304 (E.D.Mo.1987) (citing *Violet v. Picillo*, 648 F.Supp. 1283, 1288 (D.R.I.1986)).

"Citing legislative history, courts applying CERCLA have found the statute's goal to be 'overwhelmingly remedial' and, on that basis, interpreted its provisions liberally in favor of liability. *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340 (9th Cir.1992); *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1557 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752 [112 L.Ed.2d 772] (1991) (citing *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990), and *United States v.*

---

**9.** Section 9601(29) provides that "[t]he terms 'disposal', 'hazardous waste', and 'treatment' shall have the meaning provided in section 1004 of the Solid Waste Disposal Act [42 U.S.C.A. § 6903]." 42 U.S.C.A. § 9601(29) (West Supp. 1994).

**10.** Although the McMahons aver in their affidavit that "[t]hese facts [which the State asserts are uncontested] are much too vague, ..., to address the complicated issues which underlie the State's allegation that the McMahons were 'OPERATORS' as defined in CERCLA section 107(a)(2) ...", *see* McMahons' Affidavit at ¶ 3, they do not

address the State's contention that they were "owners" within the meaning of § 9607(a)(2).

**11.** The parties disagree about **who** originally brought the drums to the site. The State contends that the McMahons brought the drums which are the subject of this action onto the property after they purchased the site. The McMahons, on the other hand, assert that **all** of the drums were on the property at the time they purchased the site from Dairylea. As the court will discuss *infra*, resolution of this dispute is not necessary to the court's disposition of the present motions.

*Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 733 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987)).”

*United States v. Fleet Factors Corp.,* 821 F.Supp. 707, 712 (S.D.Ga.1993) (quoting *United States v. Fleet Factors Corp. (Fleet Factors III),* 819 F.Supp. 1079, 1083–84 (S.D.Ga.1993) (footnote omitted)).

In *Fleet Factors,* Fleet espoused an argument similar to that of the McMahons; i.e., that it was not responsible for damages caused by drums containing hazardous wastes which were on the property prior to its ownership. To understand why that argument failed, and why the McMahons' argument likewise must fail, it is important to review, in some detail, the facts of that case.

In a prior bankruptcy proceeding, the court had lifted a stay against lien enforcement and had authorized Fleet to foreclose on the SPW (the company that owned and operated the facility) inventory, equipment, and machinery. As a result of this order, Fleet hired Baldwin Industrial Liquidators, Inc. (“Baldwin”) to auction the equipment and machinery. In preparation for this sale, Baldwin straightened-up the site, grouped items for sale and moved drums containing hazardous substances to more secluded areas of the plant so that they would not interfere with public access during the liquidation auction. After the sale, Fleet allowed Nix Rigging Company (“Nix”) to salvage the remaining equipment and machinery, including most associated wiring and piping, in exchange for Nix leaving the site in a “broom-clean” condition. In doing so, Nix haphazardly shoved the drums of chemicals about the site to make way for salvage operations, backed into and crushed the drums with tractors, scraped (and chopped with hatchets) asbestos-laden insulation from equipment and machinery, and allowed that insulation to accumulate on the floor with other rubbish.

Applying CERCLA's definition of “disposal” to these activities, the court found that

Baldwin **disposed** of hazardous waste **when it deposited the dilapidated SPW chemical drums in secluded areas of the SPW plant** and **when, while moving the drums, it ruptured one and spilled its contents.** Similarly, Nix disposed of hazardous waste **when it spilled the contents of numerous SPW chemical drums** (by knocking over and by crushing those drums), **when it scraped asbestos-laden insulation from equipment and machinery** in the SPW plant, and **when it scattered the asbestos-laden insulation** throughout the site.

*Fleet Factors,* 821 F.Supp. at 721 (emphasis added).

The court went on to hold that

[d]isposal may occur even though the potentially liable party **did not introduce** the disposed of substances to the site. (citations omitted). As explained by the Ninth Circuit:

“CERCLA's definition of ‘disposal’ expressly encompasses the ‘placing of any ... hazardous waste ... on any land.’ 42 U.S.C. § 6903(3) [as incorporated into CERCLA by 42 U.S.C. § 9601(29) ]. Congress did not limit the term to the initial introduction of hazardous material onto property. Indeed, such a crabbed interpretation would subvert Congress's goal that parties who are responsible for contaminating property be held accountable for the cost of cleaning it up.”

*Kaiser,* 976 F.2d at 1342–43 (following *Tanglewood )....* Accordingly, it is **irrelevant in applying the definition of “disposal” that Baldwin and Nix did not introduce to the SPW site the waste they disposed of at that site.**

*Fleet Factors,* 821 F.Supp. at 721–22 (emphasis added).[12]

12. Similarly, other courts that have interpreted the term "disposal" have granted it a very broad meaning. *See, e.g., Nurad, Inc. v. William E. Hooper & Sons, Co.,* 966 F.2d 837, 846 (4th Cir.), *cert. denied sub nom., Mumaw v. Nurad, Inc.,* —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992) (“[W]e hold that § 9607(a)(2) imposes liability not only for active involvement in the ‘dumping’ or ‘placing’ of hazardous waste at the facility, but for ownership of the facility at a time that hazardous waste was ‘spilling’ or ‘leaking.’ ”); *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988) (“[S]ince disposal may be merely the ‘placing of any ... hazardous waste into or on any land ...,’ 42 U.S.C. § 6903(3), those who move the

Although the *Fleet Factors* decision is not binding on this court, the court finds its reasoning persuasive in light of CERCLA's comprehensive remedial purposes. Therefore, the court adopts its reasoning and will apply its principles to the facts of this case in determining whether the McMahons are responsible parties under § 9607(a)(2).

■ In the present case, it is uncontroverted that, at the very least, Mr. McMahon knew that the drums, later found to contain hazardous substances, were moved from one location to another on the site during the time that the McMahons owned the property. *See* Leary Affidavit, Exhibit C, McMahon Trial Transcript at 430–34. Moreover, it is uncontroverted that at least one, if not more, of these drums was in an "old, rusted and deteriorating" condition. *See* Leary Affidavit, Exhibit C, Stilloe Trial Transcript at 74; Suozzo Affidavit at ¶ 3; McMahon Affidavit at ¶ 5b. Given these facts, it is irrelevant whether or not Dairylea originally introduced the drums to the site. The McMahons disposed of hazardous substances when they personally relocated the drums in the alleyway, or arranged for such relocation, so that they would not interfere with the new owners' activities. Moreover, it is irrelevant whether or not the movement of the drums itself resulted in a release. The McMahons disposed of these drums when they left them in the alleyway and allowed them to deteriorate in such a way that the chemicals they contained "might" enter the environment.

■ Alternatively, the McMahons cannot escape liability based upon their argument that they took no affirmative action that "caused" the release of the hazardous substances into the environment. If the court were to permit such a cramped interpretation of the term "disposal," "[a]n owner could avoid liability simply by standing idle while an environmental hazard festers on his property. Such an owner could insulate himself from liability by virtue of his passivity, so long as he transfers the property before any

response costs are incurred." *See Nurad,* 966 F.2d at 845. Such a conclusion would result in "[t]he anomalous situation where a current owner who never [took any affirmative action with respect to the drums] could bear a substantial share of the cleanup costs, while a former owner who was similarly situated would face no liability at all." *See id.* As the *Nurad* court held "[t]he trigger to liability under § 9607(a)(2) is ownership or operation of a facility at the time of disposal, not culpability or responsibility for the contamination." *Id.* at 846 (citations omitted). Thus, the *Nurad* court concluded that "§ 9607(a)(2) imposes liability not only for active involvement in the 'dumping' or 'placing' of hazardous waste at the facility, but for ownership of the facility at a time that hazardous waste was 'spilling' or 'leaking.'" *Nurad,* 966 F.2d at 846.

The State has submitted uncontroverted evidence that the contamination of the soil surrounding the drums was the result of a gradual and progressive leaking of the hazardous substances from these drums over a period of time. In this regard, the project manager for the State's Remedial Investigation/Feasibility Studies ("RI/FS") performed at the site asserts that

[t]he entire two acre Site that includes both 6 and 8 Jackson Street (Almy properties) and 10 Jackson Street (Stilloe property) is widely contaminated with pesticides. The areas of highest pesticide contamination occur on the 6 and 10 Jackson Street properties in the alleyway where the drums were stored, and at the 6 Jackson Street storage shed....

Two of the most grossly contaminated areas at the Site are the alleyway between 8 and 10 Jackson Street where the spill occurred, and the storage shed attached to the building at 6 Jackson Street. There is also widespread soil contamination in other areas of 6, 8 and 10 Jackson Street....

Pesticide contamination is also evident in the floor and large pump in the basement of 10 Jackson Street (Stilloe property).

waste about the site may fall within the terms of the provision."); *Portsmouth Redevelopment & Hous. Auth. v. BMI Apartments Assocs.,* 827 F.Supp. 354, 358 (E.D.Va.1993) ("[M]ovement of waste after it has been placed in a state of repose

... [is] encompassed in the broad definition of disposal.") (citation omitted)); *Amland Properties Corp. v. Aluminum Co. of Am.,* 711 F.Supp. 784, 792 (D.N.J.1989) ("disposal can be such that hazardous waste 'may' enter the environment").

The interior of 6 Jackson Street (Almy property) is also contaminated with pesticides.

*See* Klatt Affidavit at ¶¶ 11, 12.

This affidavit regarding the widespread contamination of the soil around the various places where the drums were located, together with Mr. McMahon's testimony at his trial concerning the location of the drums and their movement from one place to another on the site, supports a finding that the drums were leaking during the period of the McMahons' ownership. Under circumstances such as these, the State need not pinpoint at what precise moment leakage may have begun. *See Nurad,* 966 F.2d at 846.

Applying both *Fleet Factors'* and *Nurad* 's liberal interpretation of the term "disposal" to the facts of this case, it becomes readily apparent that it is irrelevant whether the McMahons moved the drums themselves, knew of their movement, or simply stood by and allowed the drums to deteriorate during the period of their ownership of the property. The fact remains that under any of these scenarios, the hazardous substances were disposed of on the property during the time that the McMahons owned the site. Therefore, the McMahons are responsible parties under § 9607(a)(2). Accordingly, the court grants the State's motion for partial summary judgment on the issue of the McMahons' liability for the State's CERCLA response costs resulting from the release, and/or threatened release, of the hazardous substances into the environment.

### C. Arranger Liability—§ 9607(a)(3)

■ Having concluded that the McMahons are responsible parties under § 9607(a)(2), the court need not discuss, at any length, the State's alternative argument that Mr. McMahon is also a responsible party under § 9607(a)(3). In the interest of completeness, however, the court will take a moment to address the basis for imposing liability under this section of CERCLA. Section 9607(a)(3) provides, in pertinent part, that "[a]ny person who by contract, agreement, or otherwise arranged for disposal ... of hazardous substances owned or possessed by such person, by any other party or entity, at

any facility ... owned or operated by another party or entity and containing such hazardous substances, ..." is a responsible party. 42 U.S.C.A. § 9607(a)(3) (West Supp. 1994).

In *General Elec. Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281 (2d Cir.1992), the Second Circuit stated that

[C]ongress employed traditional notions of duty and obligation in deciding which entities would be liable under CERCLA as arrangers for the disposal of hazardous substances. Accordingly, the court concludes that it is the **obligation** to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances[,] that makes an entity an arranger under CERCLA's liability provision.

*Id.* at 286 (emphasis in original).

The court went on to note that "[t]he few courts that have held an entity responsible as an arranger in the absence of actual involvement have found that nexus between potentially liable party and the disposal of hazardous substances to be some obligation to arrange for or direct their disposal." *Id.* (citing *e.g., CPC International, Inc. v. Aerojet–General Corp.,* 759 F.Supp. 1269, 1278 (W.D.Mich.1991) ("[t]he nexus issue is not a test of whether a party created or left hazardous substances or had title to them, but rather whether the party **assumed responsibility** for determining their fate.") (emphasis added by Second Circuit)).

In the present case, the State contends that Mr. McMahon assumed responsibility for disposal of the drums pursuant to his contract with Mr. Stilloe which provided that "[s]ellers shall have a maximum of fifteen (15) days to remove **all personal property and debris including stored materials** from the premises being conveyed by Sellers to Buyers at Sellers' expense." *See* Leary Affidavit, Exhibit H at 3 (emphasis added). The State contends that the terms of this contract included the removal of the drums in question. To the contrary, Mr. McMahon argues that whether or not the contract's reference

to debris included the drums is a disputed issue of fact. *See* McMahon Affidavit at ¶ 5(a) and Exhibit 1 attached thereto.

The court does not believe that the evidence relied upon by Mr. McMahon creates a material issue of fact. Mr. McMahon relies upon an objection made by his attorney at his trial to the admission into evidence of the contract between Stilloe and the McMahons. At that time, his attorney, Mr. Whiting, stated that he would object to its admission for the following reasons:

> Number one, I think it's irrelevant. It describes personal property and debris, it does not mention barrels in particular. I'm not sure that it was contemplated that the personal property and debris included the barrels. There's no question that there was an agreement signed and executed, but that absolutely deals with civil responsibility, it does not mention the barrels in particular.

*See* McMahon Affidavit, Exhibit 1, Trial Transcript at 70. In response to this objection, opposing counsel sought and was granted permission by the court to lay some more foundation. In this regard, he asked Mr. Stilloe what the terms "stored materials," "personal property," and "debris" were meant to include. To which Mr. Stilloe responded:

> Everything that was in the building, alongside of the building, and I think that my lawyer drew that up. There was a lot of stuff inside the building, there was an old boat, barrels, everything, on the outside of the building. Me and Bob [Mr. McMahon] discussed that it would be gone. I didn't want that on the premises.
>
> Q. Did you ever discuss with [Mr. McMahon] about the barrels?
>
> A. The removal of them, yes.
>
> Q. When was that?
>
> A. During the sale of the property, or—during the sale of the property.
>
> Q. Would that have been prior to this agreement?

> A. Yes.
>
> Q. Would it be made part of this agreement?
>
> A. Yes.

*See id.,* Exhibit 1 at 71.

After this colloquy, counsel moved once again for admission of the contract into evidence. Mr. Whiting renewed his objection. As grounds for his continued objection, he stated that "[t]his agreement does not discuss as to barrels. It speaks to personal property and debris. If this agreement is being offered for the purposes of showing that there was some sort of responsibility that Mr. McMahon assumed for the barrels, I object. I don't think it says that." *See id.* at 71–72. To which the court responded "I can't specifically say it's being offered for that, but I can't see any reason why it's not admissible into evidence, so I'll receive it as that." *See id.* at 72.

Obviously, an attorney's objections are not evidence at a trial. Nor can they be considered evidence on a motion for summary judgment. In his affidavit, Mr. McMahon does not affirmatively assert that his contract with Mr. Stilloe did not include the drums nor at the time of his trial did he testify to that effect. Thus, the only evidence that the court may consider on this issue is the testimony of Mr. Stilloe—to the effect that the contract did include the removal of the drums. Therefore, the court holds that under this contract Mr. McMahon assumed responsibility for the fate of these drums. This conclusion, however, is not dispositive of the issue of Mr. McMahon's liability as an "arranger for the disposal" of these drums with another party at a facility owned or operated by another party and containing such hazardous substances.

With respect to this second point, the State asserts that Mr. McMahon arranged with Mr. Almy to move these drums from the Stilloe side of the property to the Almy side of the property in February 1989. *See* Leary Affidavit at ¶ 14. In support of this argument, the State relies upon the trial testimo-

ny of Mr. McMahon and Mr. Almy and Almy Brothers' Answers to Interrogatories. Mr. Almy testified that Mr. McMahon came to him in February 1989 and asked him if he could move the drums from the Stilloe side of the alley to his side of the alley and that he moved them. *See* Leary Affidavit, Exhibit C, Almy Trial Testimony at 44–45, 52–53. This testimony is supported by Almy Brothers' Answers to Interrogatories concerning these same drums. *See id.,* Exhibit E, Answers to Interrogatories, No. 12.

The testimony of Mr. McMahon which the State also relies upon to support this argument, however, is not as definitive. Although Mr. McMahon testified about moving these drums, he stated that the move from the Stilloe building to another location down the block occurred in December 1988. *See id.,* Exhibit C, McMahon Trial Testimony at 433–34. In addition, in response to the question "Wasn't there a time when you asked Len Almy if you could move these barrels from the side of Stilloe's building to his side of that alley on Jackson Street?" Mr. McMahon responded "Never." *See* Leary Affidavit, Exhibit C, McMahon Trial Testimony at 538. In light of this conflicting evidence with respect to the movement of these drums from one side of the alleyway to the other, the court concludes that a genuine issue of material fact exists as to whether Mr. McMahon arranged with Mr. Almy to move the drums from the Stilloe property to the Almy property. Thus, the court cannot conclude, as a matter of law, that Mr. McMahon is a responsible party within the meaning of § 9607(a)(3).

### III.   The McMahons' Cross-motion to Reopen Discovery

■ The McMahons cross-move, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, to reopen discovery on the grounds that recently disputed issues may be resolved by continued discovery. *See* McMahons' Notice of Cross-motion at 1. Since paragraph (e) of Rule 56 does not provide for the relief requested, the court will assume that the McMahons' cross-motion is based upon paragraph (f) of Rule 56. This paragraph provides that

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

The McMahons' attorney, in her affidavit, asserts only one reason for the need to reopen discovery. In this regard, she states

> [t]hat because of recent testimony and correspondence with the Court disputing the ownership, removal and knowledge of certain barrels of contaminated materials, (Exhibit 2), it is necessary to re-open discovery in this action, so that defendant McMahon may depose the witnesses whose testimony is in controversy, as well as witnesses who may supplement and clarify the disputed issues.

*See* Attorney Affidavit dated September 6, 1994, at ¶ 10.

Prior to filing the present cross-motion, the McMahons' attorney, in a letter to the court dated July 6, 1994, stated that "[i]t [is] necessary for me to depose several DEC personnel, Broome County personnel, and City of Binghamton personnel." *See* McMahon Letter dated July 6, 1994, at 1. She asserted that she needed to depose these individuals because "[i]t is my clients' unqualified position that New York State has been operating on this property illegally since May of 1989." *See id.* at 2. The basis for this claim is her belief that NYSDEC falsified documents and used false statements to obtain the CLASS 2 classification which it needed to remain lawfully in control of the property. *See id.*

Furthermore, Ms. McMahon stated in her letter that she needed further discovery regarding the ownership of the barrels found

on the Jackson Street property. In this regard, she asserted that

> [m]ost disturbing, however, was Ms. Leary's comments [at the July 5, 1994, pretrial conference] regarding the ownership of the barrels found on the Jackson Street property. Ms. Leary admitted to the court that Dairylea owned many of the barrels on the site but, that the barrels owned by Dairylea contained non-toxic substances. Ms. Leary went on to explain to the court that Dairylea took responsibility for these barrels and removed them from the site....
>
> This is the very first time that either my client or myself [sic] has heard the State admit that Dairylea owned any of the barrels in question. It has been my client's position from the onset that Dairylea owned these barrels. Mr. McMahon has repeatedly stated that the barrels belonged to Dairylea. Much of the testimony presented at his trial centered around the ownership of these barrels and the toxic contents of them.... State officials (DEC) testified at trial as to the toxic contents of these barrels, and to much more which erroneously linked Mr. McMahon to ownership of these barrels.... The jury was told that all of barrels [sic] belonged to Mr. McMahon.

*See id.* at 2–3.

Based upon her characterization of Ms. Leary's statements, Ms. McMahon argued that

> [t]here are many questions which must be answered. For example, How many of these barrels did Dairylea claim to own?, How did the State determine which barrels Dairylea owned?, How did the State come to allow Dairylea to remove these barrels? Where did Dairylea remove these barrels to?, When did the State allow Dairylea to remove these barrels?, What documents does the State have to support the fact that Dairylea owned some of these barrels?, What documents does the State have which indicates [sic] what barrels were taken off the site and when?, When did any State officials first have knowledge that Dairylea owned any of these barrels?, Who were these State officials?

*See id.* at 3–4.

In response to Ms. McMahon's letter, the State's attorney, by letter to the court dated July 14, 1994, stated that

> [t]he State opposes Ms. McMahon's request to conduct discovery nearly four years after the commencement of this litigation. Not only is there no need for this discovery, but Ms. McMahon presents a confused view of the facts in this case, particularly with respect to the two sets of drums found at the site and the statements made by me during our July 5, 1994 conference with the Court.

*See* State's Letter dated July 14, 1994, at 1.

Ms. Leary went on to explain that

> [t]here were two separate sets of drums found at the site by the New York State Department of Environmental Conservation ("DEC") when responding to a reported spill in 1989. The drums at the site that required emergency response by DEC and that form part of the basis for the State's CERCLA cause of action against Mr. McMahon and the other defendants were 28 abandoned drums containing pesticides and other hazardous wastes and substances. The 28 drums were found in the alleyway between the Almy property and the Stilloe property. Both properties were owned by Mr. McMahon and he abandoned the 28 drums when he sold the property to defendants Almy and Stilloe....
>
> The drums referred to by the State in the Court's July 5 conference as the "Dairylea drums" consisted of drums abandoned in the basement of the Stilloe building, in an entirely separate section of the site from where the McMahon drums were found. The Dairylea drums contained salts, food additives and detergent or cleaning solutions.
>
> The Dairylea drums, as well as the soil in the basement of the Stilloe building, were tested. Those test results showed that the contents of the Dairylea drums had *not* been released to the environment. The contents of the Dairylea drums did not

relate in any way to the widespread contamination around the site characterized by pesticide analytes....

There is widespread pesticide contamination at the site of a nature directly related to the contents of the 28 McMahon drums, however. The State has reason to believe that the contamination at the site is due to Mr. McMahon's use, storage and subsequent abandonment of pesticides there. Mr. McMahon has steadfastly refused to take any responsibility for the abandoned drums, however.

*See id.* at 2–3 (emphasis in original).

With respect to Ms. McMahon's contention that this information about the Dairylea drums is new, Ms. Leary stated that "Ms. McMahon and her parents, the McMahon defendants, are fully aware of the difference between the Dairylea drums and the McMahon drums and of the specific nature of the pesticide contamination at the site." *See id.* at 3. Finally, Ms. Leary asserted that "[t]he Dairylea drums have no bearing upon this case and are not a sufficient basis for Ms. McMahon's request to reopen discovery at this time and further delay moving this case forward." *See id.*

As stated above, even assuming that all of the drums found on the site were brought there by Dairylea, as the McMahons contend, the ownership of the drums is irrelevant. Subsequent to the initial introduction of these drums onto the site, they were "disposed" of during the period of the McMahons' ownership and, therefore, the McMahons are responsible parties within the meaning of § 9607(a)(2) and liable for the State's response costs. Thus, the questions about the drums' ownership which the McMahons seek to resolve through further discovery would not help to resolve any material issues of fact with respect to the McMahons' liability for the State's response costs. Accordingly, the court denies the McMahons' cross-motion to reopen discovery pursuant to Rule 56(f).[13]

## IV. Miscellaneous Relief

■ The State also requests that the court, pursuant to 42 U.S.C. § 9613(g)(2), declare that the McMahons and the Almy defendants are liable for all of the costs the State will incur in the future as a result of the disposal and release of hazardous substances at the site.[14] Having concluded that the Almy defendants and the McMahons are responsible parties pursuant to § 9607(a) and, therefore, liable for the State's past CERCLA response costs, the court, hereby, declares that they are, likewise, liable for the State's future response costs arising from the disposal and release of hazardous substances at the site at issue here.

■ Finally, in its reply affidavit, the State objected to the McMahons' submission of Mr. O'Malley's grand jury testimony as part of their opposition to the State's motion. In this regard, Ms. Leary stated that "Grand Jury testimony is generally protected from public disclosure. Indeed, the McMahons have no authority to release such testimony. Accordingly the State requests that the McMahon affidavit be sealed by the Court insofar as it refers to Mr. O'Malley's testimony or involves the public's view of Exhibit 6 to the McMahon affidavit." *See* Leary Reply Affidavit at ¶ 14. At oral argument, the McMahons' attorney stated that when she received the file from her clients' former attorney, the entire grand jury transcript was included therein. Given these circumstances, the court sees no need, at this time, to seal that portion of the grand jury testimony which was included as Exhibit 6 to the McMahons' Affidavit. Accordingly, the court

---

13. If the McMahons believe that Dairylea is a responsible party, and therefore jointly and severally liable with them for the State's response costs, § 9613(f) provides a method by which they may seek contribution from Dairylea. *See* 42 U.S.C.A. § 9613(f) (West Supp.1994).

14. Section 9613(g)(2) provides, in pertinent part, that "[i]n any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2) (West Supp.1994).

682

denies the State's request in this regard without prejudice and with leave to renew.

## CONCLUSION

To reiterate, as it stated from the bench, the court **GRANTS** the State's motion with respect to the CERCLA liability of the Almy defendants for the State's response costs; **DENIES** the State's motion with respect to the liability of the Almy defendants and the McMahons pursuant to New York common law of public nuisance and restitution; and **DENIES** the McMahons' cross-motion to join defendant Stilloe as a defendant in the State's motion for partial summary judgment.

As to those issues on which the court reserved decision, for the reasons stated above, the court **GRANTS** the State's motion with respect to the CERCLA liability of the McMahons for the State's response costs on the grounds that they are responsible parties within the meaning of § 9607(a)(2). In addition, the court **GRANTS** the State's request for a declaration pursuant to § 9613(g)(2) that the Almy defendants and the McMahons are responsible for the State's future response costs incurred as a result of the disposal and release of hazardous substances at the site. On the other hand, the court **DENIES** the State's request to seal the grand jury testimony attached as Exhibit 6 to the McMahons' affidavit at this time without prejudice and with leave to renew. Finally, the court **DENIES** the McMahons' cross-motion to reopen discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**